UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK



CARLOS ABREU,

    Plaintiff,

  v.

ERIC FARLEY, ET AL.,

    Defendants.

**DECISION AND ORDER**

6:11-CV-06251 EAW

## **INTRODUCTION**

  Plaintiff Carlos Abreu ("Plaintiff"), currently incarcerated at the Marcy Correctional Facility,[1] filed this action pursuant to 42 U.S.C. § 1983, alleging constitutional violations arising out of his incarceration at the Five Points Correctional Facility ("Five Points"). (Dkt. 1). After this Court's initial screening of Plaintiff's first complaint, the Court granted Plaintiff leave to proceed *in forma pauperis* ("IFP"). (Dkt. 3). Soon thereafter, Plaintiff was appointed *pro bono* counsel to assist in the prosecution of this action. (*See* Dkt. 9). Plaintiff has since filed voluminous pleadings, alleging numerous grounds for which he believes he is entitled to relief against an array of individuals.

  Presently before the Court is Defendants' motion to revoke Plaintiff's IFP status and for partial summary judgment. (Dkt. 61). For the reasons set forth below, the Court holds Defendants' motion to revoke Plaintiff's IFP status in abeyance pending the Second

---

[1]  Plaintiff's address has been ascertained from the most recent filing containing his location in this action (Dkt. 117 (notice of interlocutory appeal)), and Plaintiff's address as provided in a different action, *see Abreu v. Brown*, Case No. 6:14-cv-06599, Dkt. 60 (W.D.N.Y. Mar. 12, 2018).

- 1 -

Circuit's decision in *Shepherd v. Annucci*, No. 17-2261 (2d Cir. July 21, 2017), grants in part and denies in part Defendants' motion for partial summary judgment, and stays this action until the Court resolves Defendants' motion for IFP revocation.

## BACKGROUND

Plaintiff arrived at Five Points on or about March 25, 2010 (Dkt. 46 at ¶ 93), and alleges that he has been subject to countless constitutional infractions, and other allegedly wrongful conduct, which purportedly continued into 2012. Despite *pro bono* counsel's efforts to refine Plaintiff's allegations, the operative complaint remains voluminous and is composed of 531 paragraphs. Plaintiff's counsel also requests that the Court consider two supplemental *pro se* filings submitted by Plaintiff as part of a related case that has since been consolidated into this action. (Dkt. 93 at 25-26; *see* Dkt. 40; Dkt. 93-5; Dkt. 93-6; Dkt. 93-7; Dkt. 93-8; Dkt. 93-9; Dkt. 93-10).

The following facts are taken from Defendants' and Plaintiff's Rule 56 statements of undisputed facts. (*See* Dkt. 59-1; Dkt. 93-1). Between 2010 and January of 2012, Plaintiff was examined "well over 100 times" by medical staff at Five Points. (Dkt. 59-1 at ¶ 1; Dkt. 93-1 at ¶ 1). Although Plaintiff disputes that he was prescribed appropriate medical treatment for back and neck pain on a number of occasions (Dkt. 93-1 at ¶ 2; *cf.* Dkt. 59-1 at ¶ 2), he does not dispute that he was prescribed "an albuterol inhaler for asthma and Lipitor for elevated lipids" (Dkt. 93-1 at ¶ 2). It is also undisputed that Plaintiff received medication, bloodwork, physical examinations, and x-rays between March 25, 2010, and January 23, 2012 (*see* Dkt. 59-1 at ¶ 6; Dkt. 93-1 at ¶ 6), and that he refused to

take medications and to undergo physical examinations on several occasions while at Five Points (*see* Dkt. 59-1 at ¶ 8; Dkt. 93-1 at ¶ 8).

The parties dispute whether Plaintiff was of general good health while housed at Five Points (Dkt. 59-1 at ¶ 4; Dkt. 93-1 at ¶ 4), and whether many of Plaintiff's alleged injuries and ailments were ever properly diagnosed or observed by Five Points medical staff (Dkt. 59-1 at ¶ 5; Dkt. 93-1 at ¶ 5). Plaintiff also disputes Defendants' assertion that he was "not in imminent danger of serious physical harm at any point during the relevant period" underlying this action (Dkt. 59-1 at ¶ 3), and argues that he "endured repeated assaults, living under a constant and imminent danger [of] being subjected to ongoing threats of further physical assaults" while housed at Five Points (Dkt. 93-1 at ¶ 3). The parties do not dispute that only doctors, physicians assistants, and nurse practitioners may provide prescription medication to inmates at Five Points, that corrections officers and counselors may not do so, and that general nurses may provide limited medical treatment only in emergency circumstances. (*See* Dkt. 59-1 at ¶ 9; Dkt. 93-1 at ¶ 9).

The New York State Department of Corrections and Community Supervision ("DOCCS") maintains a policy that corrections staff seek a court order if an inmate loses 15% of his or her baseline weight, or even prior to that point if the inmate "appears in imminent need of hydration or nutrition." (Dkt. 59-1 at ¶ 10; Dkt. 93-1 at ¶ 10). In addition, it is undisputed that Plaintiff's baseline weight remained above 200 pounds between March 2010 and January 2012 (Dkt. 59-1 at ¶ 11; Dkt. 93-1 at ¶ 11), and at no point did it drop by 30 pounds, or 15% of Plaintiff's baseline weight (Dkt. 59-1 at ¶ 12; Dkt. 93-1 at ¶ 12).

At times, Plaintiff complained that he suffered from rectal bleeding, but on at least one occasion, Dr. Daniel Weinstock ("Dr. Weinstock") took Plaintiff's stool samples and discovered no blood after running hemoccult tests on April 18 and April 26, 2011. (Dkt. 59-1 at ¶ 16; Dkt. 93-1 at ¶ 16). Although Plaintiff disputes Defendants' assertion that he "frequently harassed medical staff" (Dkt. 59-1 at ¶ 17; Dkt. 93-1 at ¶ 17), it is undisputed that Five Points staff submitted written misbehavior reports regarding Plaintiff's conduct on several occasions (Dkt. 59-1 at ¶ 18; Dkt. 93-1 at ¶ 18; *but see* Dkt. 93-1 at ¶ 18 (also arguing that "false misbehavior reports were written in retaliation against [Plaintiff]")).

While Plaintiff claims that Defendants' decision not to provide him with an interpreter during his Tier II and Tier III violation hearings violated his right to due process (Dkt. 93-1 at ¶ 19), he does not dispute that he was found guilty of Tier II and Tier III violations 17 times during the relevant period underlying this action (Dkt. 59-1 at ¶ 19; Dkt. 93-1 at ¶ 19). Relatedly, Plaintiff's fluency in the English language is a point of contention between the parties. (Dkt. 59-1 at ¶ 23; Dkt. 93-1 at ¶ 23). For example, Defendants contend that Plaintiff could meaningfully converse with corrections staff in English (Dkt. 59-1 at ¶ 23), but Plaintiff states that his understanding of the English language is limited and notes that Spanish is his native language (Dkt. 93-1 at ¶ 23). Despite his disciplinary violations, Plaintiff received a "time cut" for each violation, save one, during the period extending from February 23, 2010, to July 5, 2013. (Dkt. 59-1 at ¶ 20; Dkt. 93-1 at ¶ 20). Plaintiff was not required to serve any time in the Special Housing Unit ("SHU") and did not lose any good time credits as a result of these violations. (Dkt. 59-1 at ¶ 20; Dkt. 93-1 at ¶ 20). Plaintiff did spend two months' time in the SHU for an

incident occurring in May 27, 2010, but he did not serve this time until December 2013 because he had accumulated SHU time from other incidents predating 2010. (Dkt. 59-1 at ¶ 22; Dkt. 93-1 at ¶ 22).

DOCCS Directive 4421 sets forth DOCCS' policy regarding inmate mailings. (Dkt. 59-1 at ¶ 25; Dkt. 93-1 at ¶ 25). Directive 4421 permits inmates to mail five first-class legal letters free of charge per week and allows inmates an advance of up to $20 for additional legal mail. (Dkt. 59-1 at ¶ 25; Dkt. 93-1 at ¶ 25). Inmates also receive free postage for documents that "must be sent pursuant to a Court Order, statute of limitations or legal deadline, if, by rule, such correspondence must be sent prior to receipt of the next week's free postage allowance." (Dkt. 59-1 at ¶ 26; Dkt. 93-1 at ¶ 26). Plaintiff almost always exhausted his weekly allotment of five free legal letters and used up his $20 advance immediately upon arriving at Five Points. (Dkt. 59-1 at ¶ 27; Dkt. 93-1 at ¶ 27). However, Plaintiff disputes that he was afforded free postage when a deadline so entitled him— although "on several occasions, a court order or other deadline entitled him to free postage"—and states that certain correspondence he addressed to courts, government officials, and legal organizations was refused postage. (Dkt. 93-1 at ¶ 27).

## PROCEDURAL HISTORY

On May 10, 2011, Plaintiff commenced this action by filing a voluminous 340-page complaint, alleging various injuries arising from the actions of over 130 defendants. (*See* Dkt. 1). Plaintiff also filed a motion for leave to proceed *in forma pauperis* (Dkt. 3) and a motion for appointment of counsel (Dkt. 4). By Order, dated May 25, 2011, Plaintiff was granted *in forma pauperis* status, and was directed to amend his complaint in compliance

with Rule 8 of the Federal Rules of Civil Procedure. (Dkt. 5); *see* Fed. R. Civ. P. 8(a)(2) (providing that a pleading must contain "a short and plain statement of the claim"). On August 11, 2011, Plaintiff's motion for appointment of counsel was granted and *pro bono* counsel was assigned. (Dkt. 9). On April 1, 2013, Plaintiff filed a 101-page amended complaint (Dkt. 35), and on September 19, 2013, a related case—also instituted by Plaintiff—was merged with this matter (Dkt. 40). The *pro se* complaint and supplemental filings submitted in the related case constituted a Supplemental Complaint in the instant action. (*Id.* at 12; *see* Dkt. 41).

On February 21, 2014, Plaintiff filed a 103-page second amended complaint (the "SAC"), which, alongside the *pro se* Supplemental Complaint, remains the operative pleading in this matter. (Dkt. 46). This action was reassigned to the undersigned on January 5, 2015. (Dkt. 48).

On April 6, 2015, Defendants filed a motion for partial summary judgment in lieu of an answer. (Dkt. 59). Defendants also request that the Court revoke Plaintiff's IFP status. (*See* Dkt. 59-2 at 5-6). After several appearances and extensions of time, Plaintiff filed responsive papers on July 15, 2016, opposing Defendants' motion. (Dkt. 93). Defendants filed reply papers in further support of their motion on September 21, 2016. (Dkt. 105).

## DISCUSSION

### I.    Defendants' Motion to Revoke Plaintiff's IFP Status is Held in Abeyance

A party commencing a civil action in this Court ordinarily must pay a $350.00 filing fee, as well as a $50.00 administrative fee.[2] *See* 28 U.S.C. § 1914. Of course, the Court may grant a party leave to proceed IFP if it determines that the party is unable to pay the filing fee. *See id.* § 1915. Nonetheless, not all litigants may be granted leave to proceed IFP. As set forth in 28 U.S.C. § 1915(g), the "three strikes" provision prevents prisoners from proceeding IFP if they have brought three or more lawsuits that have been dismissed as frivolous or for failure to state a claim:

> In no event shall a prisoner bring a civil action or appeal a judgment in a civil action or proceeding under this section if the prisoner has, on 3 or more prior occasions, while incarcerated or detained in any facility, brought an action or appeal in a court of the United States that was dismissed on the grounds that it is frivolous, malicious, or fails to state a claim upon which relief may be granted, unless the prisoner is under imminent danger of serious physical injury.

28 U.S.C. § 1915(g).

Thus, under that statute, a prisoner with three strikes may proceed IFP only if he can show that he is "under imminent danger of serious physical injury." *Id.* "An imminent danger is not one that has dissipated by the time a complaint is filed; rather it must be one

---

[2]    Effective May 1, 2013, the Judicial Conference of the United States added an administrative fee of $50.00 to the cost of filing a civil lawsuit in district court. *See* September 2012 Report of the Proceedings of the Judicial Conference of the United States, *available at* <http://www.uscourts.gov/about-federal-courts/reports-proceedings-judicial-conference-us>.

existing at the time the complaint is filed." *Chavis v. Chappius*, 618 F.3d 162, 169 (2d Cir. 2010) (internal quotation marks and citation omitted).[3]

The Second Circuit has instructed that, when determining whether a prisoner has shown an imminent danger, a court should "not make an overly detailed inquiry into whether the allegations qualify for the exception, because § 1915(g) concerns only a threshold procedural question." *Id.* (internal quotation marks omitted). That instruction suggests that a court should consider only the allegations in the complaint when considering whether the imminent danger applies, although the Second Circuit has not specifically limited the imminent danger review to the four corners of the complaint. *See*

---

[3] Whether the "imminent danger" must exist at the time the initial complaint was filed or whether it can arise at the time the complaint is amended has not been expressly resolved by the Second Circuit. One district court has noted that "at least some cases have indicated that even when amended complaints are filed, the imminent danger must have existed at the time the initial complaint is filed." *Antrobus v. Dapecevic*, No. 17-CV-5840 (KMK), 2018 WL 3242272, at *4 (S.D.N.Y. July 3, 2018) (citing *Harris v. City of New York*, 607 F.3d 18, 24 (2d Cir. 2010) (considering the allegations in both the initial and amended complaints, but concluding that the facts alleged did not "support a finding that [the plaintiff] was in imminent danger at the time he filed his initial complaint")); *accord Jackson v. McPartland*, No. 06-CV-6524 CJS, 2008 WL 619364, at *1 (W.D.N.Y. Mar. 4, 2008) ("[E]ven construing the *pro se* Plaintiff's Complaint and Amended Complaint liberally, as the Court is required to do, it is clear that Plaintiff has not alleged that he was in imminent danger at the time he filed this lawsuit."). Nonetheless, the Second Circuit has not definitively ruled on this issue, and there is authority outside this Circuit that supports placing the point of reference at the time the amended complaint is filed. *See Jonassen v. United States*, 671 F. App'x 668, 668 (9th Cir. 2016) ("The district court revoked Jonassen's in forma pauperis status without considering Jonassen's proposed Third Amended Complaint ('TAC'), which made plausible allegations that Jonassen was 'under imminent danger of serious physical injury' at the time he lodged the TAC."); *Burke v. St. Louis City Jails*, 603 F. App'x 525, 525-26 (8th Cir. 2015) ("[T]he District Court should have considered whether Burke met the imminent-danger exception when he filed his amended complaint, not when he filed his original complaint." (citing *Martin v. Shelton*, 319 F.3d 1048, 1051 (8th Cir. 2003))).

*id.*; *see also Abreu v. Lira*, No. 9:12-CV-1385 (NAM/DEP), 2014 WL 4966911, at *2 (N.D.N.Y. Sept. 30, 2014), *adopting report and recommendation*, 9:12-CV-1385 (NAM/DEP) (N.D.N.Y. Apr. 11, 2014).

But several courts in this Circuit—including some cases involving Plaintiff—have revoked the IFP status of a three-strikes litigant when the defendant challenges the court's preliminary finding that the litigant is entitled to the imminent danger exception, using evidence outside the four corners of the complaint to refute that preliminary finding. *See Abreu v. Brown*, 317 F. Supp. 3d 702, 705 (W.D.N.Y. 2018) ("The Court agrees with those courts that it may look beyond the complaint when considering a defendant's challenge to the preliminary finding that a three-strikes litigant is entitled to the imminent danger exception."); *Tafari v. Baker*, No. 6:16-cv-06427(MAT), 2017 WL 1406274, at *2 (W.D.N.Y. Apr. 20, 2017) (collecting cases stating the same); *Bernier v. Koenigsmann*, No. 15-CV-209A, 2017 WL 603217, at *4 (W.D.N.Y. Feb. 15, 2017) ("Although courts assessing imminent danger should not make an overly detailed inquiry, they are allowed to look at information outside the four corners of a complaint."); *Green v. Venettozzi*, No. 14-CV-1215 (BKS/CFH), 2016 WL 6902545, at *3 (N.D.N.Y. Oct. 31, 2016) ("To refute a preliminary finding with facts that satisfy the imminent danger exception, the Court may look outside the four corners of the complaint."), *report and recommendation adopted*, 2016 WL 6902180 (N.D.N.Y. Nov. 23, 2016); *Abreu v. Lira*, 2014 WL 4966911, at *2 ("In reviewing the issues surrounding plaintiff's claim that at the time he filed the complaint, he was facing imminent danger of serious physical injury, the Court agrees . . . that it is appropriate for the Court to review evidence outside the allegations of the complaint upon

defendants' challenge to plaintiff's IFP status."); *Jackson v. Jin*, No. 12-CV-6445-FPG, 2014 WL 1323211, at *1 (W.D.N.Y. Mar. 31, 2014) ("In determining whether the imminent danger exception applies, the Court may consider more recent medical evidence."). Some circuit courts have reached the same result. *See Stine v. U.S. Fed. Bureau of Prisons*, 465 F. App'x 790, 794 n.4 (10th Cir. 2012) ("[A]fter a district court provisionally grants IFP on the basis of a showing of imminent danger, the defendants are permitted to mount a facial challenge, based on full development of the facts, to the district court's provisional determination on the face of the complaint that the prisoner satisfies the imminent danger element." (quotation and alteration omitted)); *Taylor v. Watkins*, 623 F.3d 483, 485 (7th Cir. 2010) ("[W]hen a defendant contests a plaintiff's claims of imminent danger, a court must act to resolve the conflict. A contrary conclusion would mean that a three-strikes plaintiff could proceed IFP whenever his allegations of imminent danger were facially plausible, even if the defendant had incontrovertible proof that rebutted those allegations."); *Gibbs v. Roman*, 116 F.3d 83, 86 (3d Cir. 1997) ("If the defendant, after service, challenges the allegations of imminent danger . . . , the district court must then determine whether the plaintiff's allegation of imminent danger is credible . . . in order for the plaintiff to proceed on the merits [IFP]."), *overruled on other grounds by Abdul-Akbar v. McKelvie*, 239 F.3d 307 (3d Cir. 2001).

Although this Court recently agreed with this line of cases, *see Abreu v. Brown*, 317 F. Supp. 3d at 705, an appeal pending before the Second Circuit from a decision revoking IFP status after it was initially granted will likely clarify the law of this Circuit regarding this issue, *see Shepherd v. Annucci*, No. 17-2261 (2d Cir. July 21, 2017). A review of the

briefs submitted on appeal in *Shepherd* reveals that the parties dispute, among other things, the weight afforded to any evidence contradicting a plaintiff's claim of imminent danger, the distribution of the burden of proof, and the quantum of evidence required to grant a motion to revoke IFP status. *See Shepherd*, No. 17-2261, Dkt. 90; Dkt. 98. Indeed, the Second Circuit has recently deferred any decision regarding Plaintiff's motion for leave to proceed *in forma pauperis* and for appointment of counsel on the appeal from this Court's decision in *Abreu v. Brown*, and that appeal is now held in abeyance pending the Second Circuit's decision in *Shepherd*. *See Abreu v. Brown*, No. 18-2722, Dkt. 30 (2d Cir. Sept. 14, 2018). Therefore, the Second Circuit appears poised to clarify the law in this Circuit as it relates to motions to revoke IFP status. Because the *Shepherd* decision is likely to establish principles that this Court will be bound to apply in ruling upon Defendants' motion for IFP revocation, the Court is disinclined to presume the Second Circuit's position before *Shepherd* is decided. Accordingly, in the interests of judicial economy, the Court holds Defendants' motion to revoke Plaintiff's IFP status in abeyance pending the Second Circuit's decision in *Shepherd*.

## II.    <u>Summary Judgment Standard</u>

Rule 56 of the Federal Rules of Civil Procedure provides that summary judgment should be granted if the moving party establishes "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court should grant summary judgment if, after considering the evidence in the light most favorable to the nonmoving party, the court finds that no rational jury could

find in favor of that party. *Scott v. Harris*, 550 U.S. 372, 380 (2007) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)).

"The moving party bears the burden of showing the absence of a genuine dispute as to any material fact. . . ." *Crawford v. Franklin Credit Mgmt. Corp.*, 758 F.3d 473, 486 (2d Cir. 2014). "Where the non-moving party will bear the burden of proof at trial, the party moving for summary judgment may meet its burden by showing the evidentiary materials of record, if reduced to admissible evidence, would be insufficient to carry the non-movant's burden of proof at trial." *Johnson v. Xerox Corp.*, 838 F. Supp. 2d 99, 103 (W.D.N.Y. 2011) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)). Once the moving party has met its burden, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts, and may not rely on conclusory allegations or unsubstantiated speculation." *Robinson v. Concentra Health Servs., Inc.*, 781 F.3d 42, 44 (2d Cir. 2015) (quoting *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011)). Specifically, the non-moving party "must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." *Brown*, 654 F.3d at 358. Indeed, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).

A party may file a motion for summary judgment "at any time until 30 days after the close of all discovery." Fed. R. Civ. P. 56(b). A party may move for summary judgment in lieu of an answer. *See, e.g., Anderson v. Rochester-Genesee Reg'l Transp.*

*Auth.*, 337 F.3d 201, 202 (2d Cir. 2003); *Riehl v. Martin*, No. 9:13-CV-439 (GLS/TWD), 2014 WL 1289601, at *1-2 (N.D.N.Y. Mar. 31, 2014); *Beckford v. N.Y. State Office of Mental Health*, No. 06-CV-00561(SR), 2010 WL 1816689, at *1 (W.D.N.Y. May 3, 2010); *Crenshaw v. Syed*, 686 F. Supp. 2d 234, 236 (W.D.N.Y. 2010); *Wegman v. Grimmke*, No. 03-CV-234S, 2004 WL 2202642, at *2 (W.D.N.Y. Sept. 30, 2004). Although summary judgment is generally not appropriate until after some discovery has occurred in a case, *Nelson v. Deming*, 140 F. Supp. 3d 248, 257-58 (W.D.N.Y. 2015), a motion for summary judgment in lieu of an answer is appropriate where the facts are undisputed and no amount of discovery would change the outcome, *Parra v. Wright*, No. 11-CV-6270 CJS, 2013 WL 6669235, at *7 (W.D.N.Y. Dec. 18, 2013). The standard for granting summary judgment is the same whether the motion is made in lieu of an answer or after discovery has occurred—the moving party must demonstrate that no genuine issues of material fact exist and that it is entitled to judgment as a matter of law. *See Anderson*, 337 F.3d at 206.[8]

---

[8] The Court notes that in various places throughout his opposition papers, Plaintiff argues that summary judgment is inappropriate because no discovery has taken place. (*See, e.g.*, Dkt. 93 at 23, 34-35, 54). However, the lack of discovery, in and of itself, cannot justify denial of a properly supported motion for summary judgment. Moreover, although Fed. R. Civ. P. 56(d) permits a party to oppose a motion for summary judgment on the grounds that it needs discovery, any such opposition must demonstrate "by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition." *Whelehan v. Bank of Am. Pension Plan for Legacy Companies-Fleet-Traditional Ben.*, 5 F. Supp. 3d 410, 420 (W.D.N.Y. 2014) (quoting Fed. R. Civ. P. 56(d)). "The affidavit must explain: '[ (1) ] the nature of the uncompleted discovery; [ (2) ] how the facts sought are reasonably expected to create a genuine issue of material fact; [ (3) ] what efforts the affiant has made to obtain those facts; and [ (4) ] why those efforts were unsuccessful.'" *Cont'l Cas. Co. v. Marshall Granger & Co., LLP*, 921 F. Supp. 111, 127 (S.D.N.Y. 2013) (quoting *Hoffmann v. Airquip Heating & Air Conditioning*, 480 F. App'x 110, 112 (2d Cir. 2012)). "The failure to file a Rule 56(d) affidavit sufficiently explaining the need for additional discovery 'is itself sufficient grounds to reject a claim

## III. Plaintiff's Due Process Claims Are Dismissed

Plaintiff argues that he was deprived of a liberty interest without due process of law when he was not afforded an interpreter during several disciplinary hearings at which he was found guilty of the alleged wrongdoing. (*See* Dkt. 93 at 47-51). "The failure to provide interpretive services or assistive devices during disciplinary hearings has been found to be a denial [of] due process." *Young v. Polizzi*, No. 9:16-CV-0660 (FJS/CFH), 2018 WL 3949967, at *8 (N.D.N.Y. July 11, 2018) (citing *Clarkson v. Coughlin*, 898 F. Supp. 1019, 1049 (S.D.N.Y. 1995)), *report and recommendation adopted*, 2018 WL 3949942 (N.D.N.Y. Aug. 16, 2018). However, "[a]s a threshold matter, an inmate asserting a violation of his or her right to due process must establish the existence of a protected interest in life, liberty, or property." *Ocasio v. Deluke*, No. 08-CV-51 GLS/DRH, 2010 WL 6001595, at *16 (N.D.N.Y. Sept. 3, 2010) (citing *Perry v. McDonald*, 280 F.3d 159, 173 (2d Cir. 2001)), *report and recommendation adopted*, 2011 WL 864898 (N.D.N.Y. Mar. 8, 2011), *aff'd*, 468 F. App'x 89 (2d Cir. 2012).

---

that the opportunity for discovery was inadequate.'" *Lunts v. Rochester City Sch. Dist.*, 515 F. App'x 11, 13-14 (2d Cir. 2013) (quoting *Paddington Partners v. Bouchard*, 34 F.3d 1132, 1137 (2d Cir. 1994)); *see Cross v. State Farm Ins. Co.*, 926 F. Supp. 2d 436, 446 (N.D.N.Y. 2013) (stating that if "a proper affidavit or declaration" is not submitted in support of a Rule 56(d) motion, the "application fails on this basis alone"); *see also Whelehan*, 5 F. Supp. 3d at 421 ("Merely referencing the need for additional discovery in a memorandum of law in opposition to a motion for summary judgment is not an adequate substitute for a Rule 56(d) affidavit.").

Plaintiff has failed to submit an affidavit or declaration satisfying the requirements of Rule 56(d). Although the Court recognizes the early stage of this litigation, Plaintiff's conclusory requests for additional discovery in his opposition papers are insufficient to oppose Defendants' motion for summary judgment on that basis.

"The Supreme Court held in *Sandin v. Conner*, 515 U.S. 472, 115 S. Ct. 2293, 132 L. Ed.2d 418 (1995), that to state a claim for a violation of due process, a prisoner first must identify a liberty interest protected by the Due Process Clause of which he was deprived." *Jenkins v. Haubert*, 179 F.3d 19, 28 (2d Cir. 1999). To prevail on a claim for a violation of procedural due process, a prisoner "must establish both that the confinement or restraint creates an 'atypical and significant hardship' under *Sandin*, and that the state has granted its inmates, by regulation or by statute, a protected liberty interest in remaining free from that confinement or restraint." *Frazier v. Coughlin*, 81 F.3d 313, 317 (2d Cir. 1996). "Factors relevant to determining whether the plaintiff endured an 'atypical and significant hardship' include 'the extent to which the conditions of the disciplinary segregation differ from other routine prison conditions' and 'the duration of the disciplinary segregation imposed compared to discretionary confinement.'" *Palmer v. Richards*, 364 F.3d 60, 64 (2d Cir. 2004) (quoting *Wright v. Coughlin*, 132 F.3d 133, 136 (2d Cir. 1998)).

While the parties dispute whether Plaintiff required an interpreter at the disciplinary hearings (*see* Dkt. 59-1 at ¶ 23; Dkt. 93-1 at ¶ 23),[9] Plaintiff has failed to raise a triable

---

[9] The Court notes that, under New York law, "[a]n interpreter is only required when the inmate speaks no English." *Zhang v. Murphy*, 1 A.D.3d 784, 785 (3d Dep't 2003); *see* 7 N.Y.C.R.R. § 253.2 ("A non-English speaking inmate who cannot read and understand English must be given a translated notice of the charges and statements of evidence relied upon and reasons for actions taken, and provided with a translator who shall be present at the hearing."); *Maldonado v. Racette*, 175 A.D.2d 963, 963 (3d Dep't 1991) ("[T]he regulations only require the presence of an interpreter when the inmate does not speak any English."); *see also Rodriguez v. Murphy*, 19 A.D.3d 913, 913 (3d Dep't 2005) (rejecting the "petitioner's contention that he should have been provided with the assistance of a Spanish interpreter" where "the record reveals that [the] petitioner 'was sufficiently fluent

- 15 -

issue of fact as to whether he was deprived of a protected liberty interest. Indeed, Plaintiff concedes that he was not confined to the SHU for any of the disciplinary violations he was found guilty of committing, save just one. (*See* Dkt. 59-1 at ¶ 20; Dkt. 93-1 at ¶ 20); *see generally Young v. Hoffman*, 970 F.2d 1154, 1156 (2d Cir. 1992) (finding that the plaintiff had "suffered no interference with a liberty interest and has no valid claim for relief" for procedural due process where he "was never penalized on the charges of committing unhygienic acts"); *Strasser v. New York*, No. 9:10-CV-141 (FJS/DEP), 2012 WL 253391, at *3 (N.D.N.Y. Jan. 26, 2012) (dismissing a procedural due process claim where the plaintiff failed to allege whether he served any disciplinary confinement before his violation was administratively reversed).

Plaintiff did serve time in the SHU during December of 2013 for an incident occurring in May 27, 2010, but it was for a period of just two months. (*See* Dkt. 59-1 at ¶ 22; Dkt. 93-1 at ¶ 22). The Second Circuit has stated that "restrictive confinements of less than 101 days do not generally raise a liberty interest warranting due process protection, and thus require proof of conditions more onerous than usual." *Davis v. Barrett*, 576 F.3d 129, 133 (2d Cir. 2009). Generally, the plaintiff must demonstrate that the conditions of confinement under such relatively brief periods "were more severe than the normal SHU conditions . . . or a more fully developed record show[s] that even relatively brief confinements under normal SHU conditions were, in fact, atypical." *Palmer*, 364 F.3d at 65.

---

in English to understand and knowledgably participate in the disciplinary hearing'" (quoting *Santiago v. Goord*, 253 A.D.2d 970, 970 (3d Dep't 1998))).

In response to Defendants' properly supported summary judgment motion with respect to this incident (*see* Dkt. 59-6), Plaintiff has failed to set forth proof suggesting that his confinement in the SHU, beginning in December 2013 and lasting for just two months, was any more severe than normal, *Gaines v. City of New York*, No. 14 Civ. 6403 (ER), 2016 WL 951580, at *3 (S.D.N.Y. Mar. 9, 2016) (granting the defendants' motion to dismiss where the plaintiff failed to allege "any facts regarding the conditions of his confinement to suggest that it imposed 'atypical and significant hardship'"); *Vogelfang v. Capra*, 889 F. Supp. 2d 489, 511 (S.D.N.Y. 2012) (stating that "[a]bsent additional particularized allegations regarding the harshness of the confinement—which plaintiff does not adduce—[sixty days of keeplock confinement], under the case law, is insufficient to rise to the level of a due process violation"); *Sales v. Barizone*, No. 03 Civ. 6691RJH, 2004 WL 2781752, at *7 (S.D.N.Y. Dec. 2, 2004) ("Sales' other due process claim arising out of two months' confinement in the SHU, however, cannot survive the *Sandin* test absent further allegations."); *Williams v. Goord*, 111 F. Supp. 2d 280, 289 (S.D.N.Y. 2000) (finding that 75 days of solitary confinement under normal conditions did not implicate a due process liberty interest). As a result, Plaintiff has failed to establish that he was deprived of a protected liberty interest. Therefore, the Court grants summary judgment dismissing Plaintiff's due process claims.[10]

---

[10] To the extent Plaintiff seeks to raise an independent due process claim concerning the denial of his federal Freedom of Information Act ("FOIA") or New York State Freedom of Information Law ("FOIL") requests (Dkt. 46 at ¶¶ 389, 405-06), the Court construes Plaintiff's allegations as arising solely under FOIL because FOIA "applies only to federal agencies." *Chisholm v. United of Omaha Life Ins. Co.*, 514 F. Supp. 2d 318, 321 (D. Conn.

## IV. Plaintiff's Eighth Amendment Claims

### A. General Principles

"The Eighth Amendment, which applies to the states under the Due Process Clause of the Fourteenth Amendment, guarantees freedom from cruel and unusual punishment." *Jones v. Westchester Cty. Dep't of Corr. Med. Dep't*, 557 F. Supp. 2d 408, 413 (S.D.N.Y. 2008). "A prison deprivation violates the Eighth Amendment only when there is an 'unnecessary and wanton infliction of pain.'" *Barclay v. New York*, 477 F. Supp. 2d 546, 553 (N.D.N.Y. 2007) (quoting *Wilson v. Seiter*, 501 U.S. 294, 297 (1991)). "In order to prove that a prison condition amounted to cruel and unusual punishment, a plaintiff must satisfy both an objective and a subjective standard." *Stokes v. Goord*, No. 9:03-CV-1402 (LEK/DRH), 2007 WL 995624, at *4 (N.D.N.Y. Mar. 30, 2007) (citing *Jolly v. Coughlin*,

---

2007) ("Although [the plaintiff] does not say so, this Court construes her constitutional claims as having been brought under 42 U.S.C. § 1983, and her FOIA claims as arising under the Connecticut Freedom and Information Act, since the federal Freedom of Information Act, applies only to federal agencies." (citations omitted) (citing *Grand Cent. P'ship, Inc. v. Cuomo*, 166 F.3d 473, 484 (2d Cir. 1999))). Furthermore, it is well-settled that the denial of a FOIL request "does not implicate Fifth or Fourteenth Amendment due process rights, where [the] plaintiff did not pursue state law remedies." *Murray v. Coleman*, 737 F. Supp. 2d 121, 126 (W.D.N.Y. 2010), *on reconsideration* (Dec. 14, 2010); *see Reed v. Medford Fire Dep't, Inc.*, 806 F. Supp. 2d 594, 607 (E.D.N.Y. 2011) ("[I]t is well-settled in New York that section 1983 is not a proper vehicle for bringing a FOIL claim." (quotation omitted)); *see also Old St. George's LLC v. Bianco*, 389 F. App'x 33, 35 (2d Cir. 2010) ("[W]ith respect to appellants' claims relating to the alleged interference by officials of the Town of Yorktown with appellants' ability to access the Town's public records, we agree with the district court that the complaint alleges, at best, only a violation of New York's Freedom of Information Law, and not a federal constitutional claim."). Accordingly, insofar as Plaintiff alleges a § 1983 cause of action arising out of his FOIL disputes, such a claim is untenable and is dismissed.

76 F.3d 468, 480 (2d Cir. 1996)). "First, the prisoner must allege that the defendant acted with a subjectively 'sufficiently culpable state of mind.' Second, he must allege that the conduct was objectively 'harmful enough' or 'sufficiently serious' to reach constitutional dimensions." *Crawford v. Cuomo*, 796 F.3d 252, 256 (2d Cir. 2015) (citations omitted).

### 1. Subjective Element

"The subjective component of the claim requires a showing that the defendant 'had the necessary level of culpability, shown by actions characterized by "wantonness"' in light of the particular circumstances surrounding the challenged conduct." *Sims v. Artuz*, 230 F.3d 14, 21 (2d Cir. 2000) (quoting *Blyden v. Mancusi*, 186 F.3d 252, 262 (2d Cir. 1999)); *see Swift v. Tweddell*, 582 F. Supp. 2d 437, 444 (W.D.N.Y. 2008) ("To establish deliberate indifference, then, plaintiff must prove that the defendants had a culpable state of mind and intended wantonly to inflict pain."). "Deliberate indifference is a mental state equivalent to subjective recklessness, as the term is used in criminal law. This mental state requires that the charged official act or fail to act while actually aware of a substantial risk that serious inmate harm will result." *Salahuddin v. Goord*, 467 F.3d 263, 280 (2d Cir. 2006) (citation omitted).

### 2. Objective Element

The objective requirement "does not mandate comfortable prisons," *Rhodes v. Chapman*, 452 U.S. 337, 349 (1981); "[o]nly 'deprivations denying the minimal civilized measure of life's necessities are sufficiently grave to form the basis of an Eighth Amendment violation,'" *Salahuddin*, 467 F.3d at 279 (quoting *Wilson*, 501 U.S. at 298). "States must not deprive prisoners of their 'basic human needs—e.g., food, clothing,

shelter, medical care, and reasonable safety.'" *Phelps v. Kapnolas*, 308 F.3d 180, 185 (2d Cir. 2002) (quoting *Helling v. McKinney*, 509 U.S. 25, 32 (1993)). In other words, the objective component requires that a prisoner "prove that the conditions of his confinement violate contemporary standards of decency." *Id.*

### B. Allegations of Contaminated Food

"[T]he Eighth Amendment prohibition against cruel and unusual punishment does require that prisoners be served 'nutritionally adequate food that is prepared and served under conditions which do not present an immediate danger to the health and well being of the inmates who consume it.'" *Robles v. Coughlin*, 725 F.2d 12, 15 (2d Cir. 1983) (quoting *Ramos v. Lamm*, 639 F.2d 559, 571 (10th Cir. 1980)). "In food tampering claims a plaintiff must allege that he suffered an actual injury, 'the mere allegation of food tampering alone [ ] is insufficient to establish a claim under the Eighth Amendment.'" *Calvin v. Schmitt*, No. 15 CV-6584 (NSR), 2017 WL 4280683, at *5 (S.D.N.Y. July 7, 2017) (alteration in original) (quoting *Harris v. Ashlaw*, No. 9:07-CV-0358(LEK/DEP), 2007 WL 4324106, at *5 (N.D.N.Y. Dec. 5, 2007)).

Here, Plaintiff's alleged food contamination is too speculative to survive summary judgment. Plaintiff alleges that the food loaves[11] he received "were wet[,]" as if C.O. Countryman had spit in his food. (Dkt. 93-5 at ¶ 41; *see also id.* at ¶ 107 (alleging that C.O. Countryman "was spitting on my loa[ves]")). He also alleges that some of the food

---

[11] A "food loaf" generally "contains a variety of ingredients, including carrots and potatoes." *Alexander v. Whitney*, No. 9:04-CV-1298 (LEK/GJD), 2008 WL 904897, at *6 n.8 (N.D.N.Y. Mar. 31, 2008).

items he received had been opened and mixed around or were broken into pieces. (*See id.* at ¶ 107). "[A] plaintiff's allegation that 'Defendants spit in his food and 'violat[ed][his] bread by making holes in it,' without more, has been found insufficient to state an Eighth Amendment violation." *Bee v. Krupp*, No. 08 Civ.10141 (SHS)(KNF), 2009 WL 2981910, at *3 (S.D.N.Y. Sept. 15, 2009) (quoting *Chavis v. Kienert*, No. 9:03-CV-0039(FJSRFT), 2005 WL 2452150, at *21 (N.D.N.Y. Sept. 30, 2005)). Plaintiff's allegations that C.O. Countryman either spit on his loaves or otherwise tampered with his food are conclusory and unsubstantiated. Without more, such bare-bone allegations are insufficient to sustain an Eighth Amendment conditions-of-confinement cause of action. *See Sital v. Burgio*, 592 F. Supp. 2d 355, 359 (W.D.N.Y. 2009) ("the allegations in the Amended Complaint that Defendant Karamonos 'spit' in [p]laintiff's food and poked his finger in [p]laintiff's food are conclusory and unsubstantiated. . . . Plaintiff provides no factual support for the contention and, therefore, the claim in subject to dismissal" (quoting *Zimmerman v. Seyfert*, No. 9:03-CV-1389(TJM), 2007 WL 2080517, at *29 (N.D.N.Y. July 19, 2007))); *Bee*, 2009 WL 2981910, at *3 (concluding that the plaintiff's allegations that "'visible globs of spit' were present in his food" did not give rise to an Eighth Amendment violation).

Plaintiff also makes the general assertion that his food was "regularly and frequently contaminated and or spoiled." (Dkt. 93-5 at ¶ 190). He further alleges that he became nauseous and was forced to vomit after eating the food loaves. (*Id.*). Plaintiff also allegedly experienced stomach pains and anal bleeding, which were "*possibly* due to bacterias [sic], and parasites due to the spoiled foods" and the "dirty hands" of the correctional officers and their practice of "spitting" into his food. (*Id.* (emphasis added)).

Plaintiff's allegations are self-serving and completely unsupported. *See Martinez v. Lape*, No. 9:09-CV-0665 (TJM/RFT), 2011 WL 4527943, at *9 (N.D.N.Y. Mar. 28, 2011) ("Other than the unsupported broad assertion that he contracted H. pylori from the food or water at Coxsackie, Plaintiff fails to allege how the expired food and juice posed an immediate risk to his health, inflicted pain and suffering, or otherwise amounted to an extreme deprivation."), *report and recommendation adopted*, 2011 WL 4528980 (N.D.N.Y. Sept. 28, 2011). Conclusory claims of spoiled food are insufficient to survive a dispositive motion. *See Black v. Fischer*, No. 9:08-CV-0232, 2010 WL 2985081, at *8 (N.D.N.Y. July 1, 2010) (stating that the "plaintiff's food complaints consist entirely of broad and conclusory allegations which, while at first blush troublesome, are devoid of the specifics necessary to prove such a claim"); *Dorsey v. Fisher*, No. 9:09-CV-1011 (GLS)(DEP), 2010 WL 2008966, at *7 (N.D.N.Y. May 19, 2010) (dismissing an Eighth Amendment claim based on contaminated food where the plaintiff alleged, in "conclusory fashion," a conspiracy to "poison[] his food with infected DNA").

Furthermore, the injuries that allegedly resulted from Plaintiff's ingestion of the food loaves are not borne out by the medical evidence. *See Stokes*, 2007 WL 995624, at *4 ("[A]lthough Stokes makes general allegations regarding the health effects he suffered because of the alleged contaminated and inadequate food, there is nothing in his medical records to indicate that he suffered any adverse health effects from the food served to him by defendants."). While a Court must view the evidence in the light most favorable to the non-movant on a motion for summary judgment, "[v]ague assertions supported only by self-serving statements," even if found "in the nonmoving party's affidavit[,] are

insufficient to defeat a properly supported summary judgment motion." *Moe v. United States*, 668 F. Supp. 2d 497, 502 (W.D.N.Y. 2009); *see also Brown v. Eagen*, No. 9:08-CV-0009 (TJM/DRH), 2009 WL 815724, at *10 (N.D.N.Y. Mar. 26, 2009) (rejecting the plaintiff's "allegations that his food was contaminated" by blood, feces, semen, and chemicals as so "conclusory and fantastic as to rise to the level of factually frivolous"). Indeed, outside his general allegations that the correctional officers had "dirty hands" and were "spitting" in his food, Plaintiff provides no credible basis to support the assertion that he was actually exposed to harmful "bacteria[]" or "parasites." *See generally Stokes*, 2007 WL 995624, at *4 ("[A]lthough Stokes contends that defendants delivered him the food, he fails to allege that he saw any of them actually contaminate or tamper with his food.").

Therefore, Plaintiff's Eighth Amendment claim for cruel and unusual punishment, based upon the alleged contamination of his food, is dismissed because he has failed to raise an issue of material fact sufficient to satisfy the objective element of this cause of action.

## C. Deliberate Medical Indifference

For purposes of opposing Defendants' motion, Plaintiff "focuses on his most serious untreated medical conditions." (Dkt. 93 at 30). These conditions include the injuries he allegedly sustained during an "assault that occurred on March 30, 2010, the chronic back and neck pain that was at issue in the March 30, 2010 assault, for which he requires at least pain medication and a back brace, and the acute incident of a potential heart attack he suffered on April 2, 2010." (*Id.*).

"The Eighth Amendment [also] forbids 'deliberate indifference to serious medical needs of prisoners. . . .'" *Spavone v. N.Y. State Dep't of Corr. Servs.*, 719 F.3d 127, 138 (2d Cir. 2013) (quoting *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)). This category of Eighth Amendment violation also requires the satisfaction of objective and subjective elements. In the context of a deliberate indifference claim, the objective component requires that "the alleged deprivation of adequate medical care . . . be 'sufficiently serious,'" *Salahuddin*, 467 F.3d at 279 (quoting *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)), while the subjective component requires that "the charged officials . . . be subjectively reckless in their denial of medical care," *Spavone*, 719 F.3d at 138.

The "sufficiently serious" element is analyzed more broadly where the alleged claim amounts to "a failure to provide any treatment for an inmate's medical condition" than "where the inadequacy is in the medical treatment given." *Salahuddin*, 467 F.3d at 280. In the former scenario, the focus is on whether "the inmate's *medical condition* is sufficiently serious," whereas the latter situation emphasizes the treatment itself. *Id.* (emphasis added); *see Smith v. Carpenter*, 316 F.3d 178, 185 (2d Cir. 2003) ("When the basis for a prisoner's Eighth Amendment claim is a temporary delay or interruption in the provision of otherwise adequate medical treatment, it is appropriate to focus on the challenged delay or interruption in treatment rather than the prisoner's underlying medical condition alone.").

"It appears that no courts have specifically addressed neck pain in the context of a deliberate indifference claim." *Medina v. Barrett*, No. 14-CV-6377-FPG, 2018 WL 1383232, at *6 (W.D.N.Y. Mar. 19, 2018). However, "courts have held that '[s]evere back

pain, especially if lasting an extended period of time, can amount to a "serious medical need" under the Eighth Amendment.'" *Guarneri v. Hazzard*, No. 9:06-CV-0985, 2008 WL 552872, at *6 (N.D.N.Y. Feb. 27, 2008) (quoting *Nelson v. Rodas*, No. 01-CV-7887 (RCC/AJP), 2002 WL 31075804, at *14 (S.D.N.Y. Sept. 17, 2002)); *see Mosley v. Woodly*, No. 9:11-CV-1490, 2013 WL 5347272, at *4 (N.D.N.Y. Sept. 23, 2013) ("Courts have found chronic, debilitating back pain to be a serious injury for Eighth Amendment purposes.").

Plaintiff appears to quarrel with the medical treatment he received at Five Points and challenges the propriety of the Five Points medical staffs' decision to interrupt treatment previously prescribed by other correctional facilities. Specifically, Plaintiff disputes Dr. Weinstock's decision to remove his back brace on March 30, 2010, even though Plaintiff informed Dr. Weinstock that it had been prescribed by physicians at another correctional facility, who had also recommended physical therapy and pain medication to treat his chronic back pain. (Dkt. 93 at 30; *see* Dkt. 46 at ¶¶ 101, 103-04). However, Plaintiff's contentions merely challenge Dr. Weinstock's medical judgment, and Plaintiff submits no medical evidence demonstrating that a back brace should have been continued as a form of treatment. *See Evan v. Manos*, 336 F. Supp. 2d 255, 263 (W.D.N.Y. 2004) (stating that the plaintiff's opinion that the defendant "should have prescribed a back brace is also inadequate to give rise to any issue of fact about whether his constitutional rights were violated," and noting that "[t]here is no medical evidence that a back brace was medically called for or that it would have relieved plaintiff's alleged pain"). "It is well-established that mere disagreement over the proper treatment does not create a

constitutional claim." *Chance v. Armstrong*, 143 F.3d 698, 703 (2d Cir. 1998). "Disagreement over treatment relates to an issue of medical judgment and at worst, amounts to medical malpractice, not a constitutional violation." *Tavares v. N.Y.C. Belleview Hosp.*, No. 13 CV 3148 (PKC)(MHD), 2015 WL 7736544, at *5 (S.D.N.Y. Nov. 30, 2015) (citing *Estelle*, 429 U.S. at 106).

Indeed, Dr. Weinstock indicates that his decision to remove the back brace and to discontinue some of Plaintiff's pain medications was based upon his medical examination of Plaintiff and objective medical evidence, such as x-rays. (Dkt. 59-9 at ¶¶ 24-28); *see Lewis v. Alves*, No. 01-CV-0640A(SR), 2004 WL 941532, at *6 (W.D.N.Y. Mar. 22, 2004) (stating that the defendant's decision to deny drug treatment while the plaintiff completed "an alcohol and drug treatment program was based upon objective medical criteria and the exercise of [the defendant's] medical judgment," and thus, could not support a medical indifference claim); *see also Munlyn v. Pietrie*, No. 13-CV-6170FPG, 2014 WL 3695488, at *6 (W.D.N.Y. July 24, 2014) (stating that the plaintiff's allegations only reflect his "disagreement with [the medical staff's] evaluation and assessment of his medical circumstances" where he claims that they "did not believe he had any pain, or disputed the severity of the pain," and then they "refused [the p]laintiff's requests to see the doctor," removed his neck brace and walking cane, disapproved physical therapy, and told him "to stop lying"). Furthermore, Dr. Weinstock affirms that Plaintiff was often seen multiple times a week by the Five Points medical staff (Dkt. 59-9 at ¶ 7), an averment that is borne out by the medical records submitted by Defendants (*see* Dkt. 59-10).

Plaintiff also argues that Defendants consistently ignored his chronic back and neck pains. (Dkt. 93 at 31 & n.8). However, "a delay in medical treatment does not necessarily give rise to an Eighth Amendment violation." *Pagan v. Corr. Med. Servs.*, No. 11 Civ. 1357 (ER), 2013 WL 5425587, at *12 (S.D.N.Y. Sept. 27, 2013). Where delays in medical treatment have implicated Eighth Amendment concerns, "they have involved either a needlessly prolonged period of delay, or a delay which caused extreme pain or exacerbated a serious illness." *Ferguson v. Cai*, No. 11 Civ. 6181 (PAE), 2012 WL 2865474, at *4 (S.D.N.Y. July 12, 2012).

As such, Plaintiff's allegations must be viewed in context; it appears that Plaintiff frequently sought and received some form of medical attention, and it is undisputed that he was examined by medical personnel "well over 100 times" while housed at Five Points. (Dkt. 59-1 at ¶ 1; Dkt. 93-1 at ¶ 1). Simply because Plaintiff was not examined each and every day he complained of some form of chronic pain does not demonstrate that Defendants were deliberately indifferent to a serious medical need. At least under the circumstances presented here, where the medical records reveal that Plaintiff was examined and/or prescribed medications multiple times a month and sometimes several times a week, Plaintiff's assertion that Defendants ignored his complaints of pain fails to establish a viable constitutional cause of action. (*See* Dkt. 59-10). Indeed, many of Plaintiff's medical evaluations were only separated by a matter of days. *See Youngblood v. Glasser*, No. 9:10-CV-1430 (NAM/DEP), 2012 WL 4051846, at *8 (N.D.N.Y. Aug. 22, 2012) ("Plaintiff maintains that his constitutional rights were violated as a result of a five-day delay in arranging for a physician to examine his hemorrhoids. Proof of such complaints and the

modest delay at issue is not sufficient to establish an Eighth Amendment claim."), *report and recommendation adopted*, 2012 WL 4051890 (N.D.N.Y. Sept. 13, 2012); *Williams v. Raimo*, No. 9:10-CV-245 (MAD/GHL), 2011 WL 6026111, at *5 (N.D.N.Y. Dec. 2, 2011) (noting that any delay in treating "a prisoner's injuries from the weekend to the next business day does not constitute deliberate indifference where the prisoner 'submitted no medical evidence showing any negative effect of the delay'" (quoting *Croft v. Hampton*, 286 F. App'x 955, 959 (8th Cir. 2008))); *Alster v. Goord*, 745 F. Supp. 2d 317, 335 (S.D.N.Y. 2010) (dismissing the plaintiff's medical indifference cause of action where he claimed that the defendants "waited two days after he complained of abdominal pain to take him to the hospital"); *Evan*, 336 F. Supp. 2d at 261 (finding that a "nine-day delay between being placed on the callout list and plaintiff's initial visit" was not actionable where the plaintiff "has not identified anything that [the defendant] could or should have done had he examined plaintiff sooner, nor has he shown that he was harmed by any delay in treatment"); *see also Colon v. Plescia*, No. CIVA9:07-CV-0727(DNH/DE), 2009 WL 2882944, at *7 (N.D.N.Y. July 27, 2009) ("Where a plaintiff's claim is based on a delay in medical treatment, the plaintiff must show that substantial harm resulted from the delay itself."), *report and recommendation adopted*, 2009 WL 2914160 (N.D.N.Y. Sept. 4, 2009).[12]

---

[12] Insofar as Plaintiff asserts a medical indifference claim based upon the many allegedly unwarranted denials of his sick-call slips (*see, e.g.*, Dkt. 46 at ¶¶ 190, 193, 196, 200-01, 203-04, 206, 216-17, 223, 226, 245, 252, 265, 267, 285), it too is unsupported by the evidence, *see Kee v. Hasty*, No. 01 Civ.2123 (KMW)(DF), 2004 WL 807071, at *29 (S.D.N.Y. Apr. 14, 2004) (rejecting the plaintiff's "overly conclusory" allegations that the

Notably, despite Plaintiff's claim of medical indifference, it is undisputed that he failed to cooperate with medical staff or refused to take his prescribed medications on several occasions. (Dkt. 59-1 at ¶ 8; Dkt. 93-1 at ¶ 8); *see generally Buffaloe v. Fein*, No. 12 Civ. 9469 (GBD) (AJP), 2014 WL 1224446, at \*2 (S.D.N.Y. Mar. 20, 2014) (noting that the plaintiff's "medical records indicate that he often refused treatment" and that a "plaintiff's refusal of medical treatment 'has been found to effectively rebut[] . . . claims of deliberate indifference to serious medical needs'" (alteration in original) (quoting *Rivera v. Goord*, 253 F. Supp. 2d 735, 756 (S.D.N.Y. 2003))). Whether or not Plaintiff ultimately

___

defendants failed to treat him where he failed "to specify the dates on which [he] was denied proper treatment, the nature of his needs on those dates, and the nature of the treatment that was purportedly denied"); *Sonds v. St. Barnabas Hosp. Corr. Health Servs.*, 151 F. Supp. 2d 303, 309 (S.D.N.Y. 2001) ("[A] generalized claim that an inmate was denied access to medical treatment will not suffice."); *Vento v. Lord*, No. 96 Civ. 6169 (SS), 1997 WL 431140, at \*4 (S.D.N.Y. July 31, 1997) (dismissing the deliberate medical indifference claim where the plaintiff complained that "the medical staff will not see me fit . . . for medical attention," but failed to provide sufficient allegations regarding the denial of his sick call requests or the nature of those requests). Indeed, "[t]he issue in this case is not whether [the plaintiff] was seen every time that he requested sick call, but whether the defendants were deliberately indifferent to his serious medical needs concerning his back pain." *Butler v. Weissman*, No. CIV.9:00-CV-1240 (LEK/GLS), 2002 WL 31309347, at \*5 (N.D.N.Y. June 20, 2002). In light of the extensive medical record, which demonstrates that Plaintiff was frequently seen in the infirmary multiple times a month, and sometimes several times a week, any claim of medical indifference based upon the wrongful denial of Plaintiff's sick-call slips is unsustainable. *See Davidson v. Desai*, 817 F. Supp. 2d 166, 190-91 (W.D.N.Y. 2011) (concluding that the plaintiff failed to point to "a request seeking sick call for a serious medical need sufficient to support a jury verdict on the claim" where the plaintiff's medical record establishes that he "was seen in sick call multiple time[s] each month"); *see generally Arnow v. Aeroflot Russian Airlines*, 980 F. Supp. 2d 477, 482 (S.D.N.Y. 2013) ("[S]elf-serving, conclusory affidavits, standing alone, are insufficient to create a triable issue of fact and to defeat a motion for summary judgment." (citing *BellSouth Telecomms., Inc. v. W.R. Grace & Co.-Conn.*, 77 F.3d 603, 615 (2d Cir. 1996))).

agreed with the medical staff's evaluations and the medication and treatments prescribed during his numerous examinations, Plaintiff's "personal dissatisfaction" with the treatment received does not give rise to a constitutional violation. *See Wright v. Conway*, 584 F. Supp. 2d 604, 607 (W.D.N.Y. 2008) ("Wright's complaints demonstrate no more than his personal dissatisfaction with the level of care that he received, and these claims must therefore be dismissed.").

Plaintiff also references a "potential heart attack" that he allegedly suffered on or about April 2, 2010. (*See* Dkt. 93 at 32-33). Plaintiff alleges that Dr. Weinstock and nurse Annette Holm ("Nurse Holm") ignored his complaints of chest pain, which he could feel spreading over his left shoulder. (*See* Dkt. 46 at ¶¶ 124-26). Plaintiff further alleges that he had difficulty breathing and speaking at that time as well. (*Id.* at ¶ 125). The medical staff allegedly ignored these symptoms even though they suggested that Plaintiff was suffering from a "potential heart attack." (*Id.* at ¶ 126).

Plaintiff fails to provide any evidence—medical or otherwise—to explain the difference between a "potential" heart attack and an actual heart attack, or to associate his alleged symptoms with any other cardiovascular health-related issues. Furthermore, a review of the medical records reveals that Plaintiff was examined several times on April 2, 2010, and in the following days. (*See* Dkt. 59-10 at 131-33). For example, on April 2, 2010, Plaintiff complained of chest pain and discomfort in his left shoulder, but the medical staff noted that he was "talking easily," without any shortness of breath, and that his blood pressure had been taken. (*Id.* at 133). Dr. Weinstock was notified of the assessment, and the medical staff ordered Plaintiff to be evaluated again in an hour. (*Id.*). After one hour

- 30 -

had passed, Plaintiff was observed "talking easily" without shortness of breath. (*Id.*). Plaintiff was instructed to request an escort back to the infirmary if he experienced an increase in pain, shortness of breath, or dizziness, but was otherwise told to return for a follow-up in the morning. (*Id.*).

The next morning, Plaintiff complained of a cough, chronic pain in his right arm, neck, back, both wrists, legs, face, and head, but apparently did not indicate whether he felt pain in his chest or shoulder. (*Id.*). Plaintiff was then provided with some ritussin and ibuprofen. (*Id.*). Later that morning, Plaintiff returned to the infirmary, where he again complained of pain in his back, wrist, head, face, and right arm, but displayed no signs of redness or swelling. (*Id.* at 132). Plaintiff did not appear to exhibit any shortness of breath, and he was "talking easily." (*Id.*). Plaintiff also indicated that he "doesn't feel too much compression to [his] chest." (*Id.*). On April 7, 2010, Plaintiff again complained of some "difficulty breathing," but was examined and prescribed treatment. (*Id.* at 131). The medical notes dated April 10, 2010, reveal that Plaintiff was "talking easily" without any shortness of breath, and no subjective complaints of chest or shoulder pain were recorded. (*Id.*).

In sum, the above-referenced medical progress notes wholly undermine Plaintiff's contention that he suffered a sufficiently serious cardiovascular event that was ignored by the Five Points medical staff. Even if Plaintiff suffered a "potential heart attack," the medical records demonstrate that he was provided with consistent care and treatment at the time his symptoms arose and in the days that followed—Plaintiff points to no medical

evidence demonstrating that the medical staff were "subjectively reckless" in their examination of Plaintiff's condition. *Spavone*, 719 F.3d at 138.

Plaintiff has strategically chosen to focus his opposition papers on a few of the most allegedly egregious instances of deliberate indifference to a serious medical need asserted by Plaintiff in this action. Although the Court has reviewed the balance of Plaintiff's alleged medical indifference claims against the medical records submitted by Defendants, "in deciding a motion for summary judgment, a District Court is not required to 'scour the record on its own in a search for evidence' where the non-moving party fails to adequately present it." *In re World Trade Ctr. Lower Manhattan Disaster Site Litig.*, 44 F. Supp. 3d 409, 426 (S.D.N.Y. 2014) (quoting *CILP Assocs. LP v. PriceWaterhouse Coopers LLP*, 735 F.3d 114, 125 (2d Cir. 2013)). Here, Defendants have established that Plaintiff was medically examined on "numerous occasions" while incarcerated at Five Points, and sometimes multiple times a week. (Dkt. 59-4 at ¶¶ 4-6; *see* Dkt. 59-7 at ¶ 9; Dkt. 59-9 at ¶ 4, 7, 18). Despite Plaintiff's frequent complaints of medical ailments, these complaints were not substantiated by objective medical examination. (*See* Dkt. 59-4 at ¶ 9; Dkt. 59-7 at ¶¶ 10-12; Dkt. 59-9 at ¶¶ 9, 24-28, 34, 68-69). Furthermore, Plaintiff was often prescribed medications to relieve him of the subjective pain or discomfort he complained of, and he would usually receive medications at least once a day while housed in the SHU. (*See* Dkt. 59-4 at ¶¶ 6-7, 20; Dkt. 59-7 at ¶ 8; Dkt. 59-9 at ¶¶ 5, 18, 23-24, 28, 30). These averments are borne out by the medical records submitted by Defendants. (*See* Dkt. 59-10). In response, Plaintiff has submitted no medical evidence to substantiate his claims of deliberate indifference—instead, he relies on only his conclusory claims. In light of the

robust medical records documenting Plaintiff's treatment, Plaintiff's self-serving averments are insufficient to raise a triable issue of fact as to whether he suffered constitutionally inadequate medical care during his confinement at Five Points. *See Scott v. Koenigsmann*, No. 9:12-CV-1551, 2016 WL 1057051, at *12 (N.D.N.Y. Mar. 14, 2016) (finding the record did not establish that the defendant "acted with deliberate indifference or deliberately ignored [the p]laintiff's complaints of pain" where the plaintiff "received a plethora of prescription medication for chronic low back pain and was routinely treated at Sick Call, by nurse practitioners and consulted with medical providers").

Accordingly, summary judgment is granted in favor of Defendants dismissing Plaintiff's Eighth Amendment claim for deliberate medical indifference.[13]

---

[13]     To the extent Plaintiff raises a related claim for the deprivation of constitutionally protected medical confidentiality (Dkt. 46 at ¶¶ 221, 258-59, 292), the Court notes that "[c]ourts within this Circuit have accorded constitutional privacy protection to a handful of medical conditions only, including HIV, transsexualism and sickle cell anemia," *Myers v. Dolac*, No. 09-CV-6642P, 2013 WL 5175588, at *7 (W.D.N.Y. Sept. 12, 2013). Constitutional protection will only extend to a medical condition that "is both serious in nature and the type that is 'excruciatingly private and intimate in nature' such as those 'likely to provoke . . . an intense desire to preserve one's medical confidentiality.'" *Id.* (quoting *Matson v. Bd. of Educ. of City Sch. Dist. of N.Y.*, 631 F.3d 57, 64 (2d Cir. 2011)). As such, this constitutional right is limited in scope and exists only under "narrow parameters." *Matson*, 631 F.3d at 65 (quoting *Powell v. Schriver*, 175 F.3d 107, 112 (2d Cir. 1999)). In determining whether constitutional protection extends to a particular medical condition, "courts must determine whether the disease is 'contagious . . . or attributed in any way to socially repugnant conduct and whether it could be said that society as a whole views [the disease] as directly associated with any disease which might conceivably be characterized as loathsome.'" *Myers*, 2013 WL 5175588, at *7 (quoting *Matson*, 631 F.3d at 66).

The instant matter "is not a case in which plaintiff has an unusual medical problem which, if disclosed unnecessarily to other inmates, would likely expose plaintiff to discrimination, intolerance, or potential violence." *Rodriguez v. Ames*, 287 F. Supp. 2d

## D. Eighth Amendment Excessive Use of Force

In order for an Eighth Amendment excessive force claim to survive a motion for summary judgment, the evidence, viewed in the light most favorable to the non-moving party, must go "beyond a mere dispute over the reasonableness of a particular use of force or the existence of arguably superior alternatives," and instead "support a reliable inference of wantonness in the infliction of pain. . . ." *Whitley v. Albers*, 475 U.S. 312, 322 (1986). "'[S]ome degree of injury is ordinarily required to state a claim' of excessive use of force in violation of the Eighth Amendment." *Taylor v. N.Y. Dep't of Corr.*, No. 10 CIV. 3819 (JPO), 2012 WL 2469856, at *4 (S.D.N.Y. June 27, 2012) (quoting *United States v. Walsh*, 194 F.3d 37, 50 (2d Cir. 1999)). Accordingly, "a *de minimis* use of force will rarely suffice to state a constitutional claim." *Romano v. Howarth*, 998 F.2d 101, 105 (2d Cir. 1993). Indeed, "[t]he extent of injury suffered by an inmate is one factor that may suggest 'whether

213, 220 (W.D.N.Y. 2003) (rejecting the plaintiff's claim where he had been "diagnosed with proctitis, a nontoxic inflammation of the mucose tissue of the rectum, and internal hemorrhoids"); *see Webb v. Goldstein*, 117 F. Supp. 2d 289, 298 (E.D.N.Y. 2000) (finding no right to privacy attendant to medical records containing information about the plaintiff's treatment for genital conditions); *see also Myers*, 2013 WL 5175588, at *7 ("[C]ourts have declined to recognize constitutional protection for many other medical conditions, including fibromyalgia, arthritis and sleep apnea."); *Ebert v. Hargreaves*, No. 4:11CV3139, 2012 WL 642470, at *3 (D. Neb. Feb. 28, 2012) (assuming that prisoners enjoy a limited right to privacy in medical information, the plaintiff failed to establish a violation of that right where he alleged that the defendant spoke about the plaintiff's "back pain in front of other inmates"); *see generally Kendall v. Kittles*, No. C0 CIV. 628 (GEL), 2004 WL 1752818, at *6 (S.D.N.Y. Aug. 4, 2004) ("Hemorrhoids, albeit uncomfortable, are a minor health issue, far removed from the category of medical conditions that have been deemed 'sufficiently serious' by other courts."). Accordingly, Plaintiff has failed to raise a triable issue of fact as to whether he was deprived his limited right to privacy in medical information.

the use of force could plausibly have been thought necessary' in a particular situation." *Wilkins v. Gaddy*, 559 U.S. 34, 37 (2010) (quoting *Hudson v. McMillian*, 503 U.S. 1, 7 (1992)).

However, "an inmate 'need not prove "significant injury" to make out an excessive force claim.'" *Banks v. County of Westchester*, 168 F. Supp. 3d 682, 688 (S.D.N.Y. 2016) (quoting *Griffin v. Crippen*, 193 F.3d 89, 92 (2d Cir. 1999)). "[T]he core judicial inquiry is that set out in *Whitley*: whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Hudson*, 503 U.S. at 7.

Factors to consider in determining whether prison officials unnecessarily and wantonly inflicted pain include: (1) the extent of the injury suffered; (2) the need for the application of force; (3) the relationship between the need and the amount of force used; (4) the threat reasonably perceived by the responsible officials; and (5) any efforts made to temper the severity of a forceful response. *Romano v. Howarth*, 998 F.2d 101, 105 (2d Cir. 1993) (citing *Hudson*, 503 U.S. at 7).[14]

---

[14] Although Plaintiff submits responsive papers opposing summary judgment on almost every one of his alleged assaults (*see* Dkt. 93 at 36-45), Defendants indicate that they have only moved to dismiss the allegations pertaining to the March 30, 2010, and September 27, 2011, incidents (*see* Dkt. 105-2 at 8; *see also* Dkt. 59-2 at 79 ("[T]he Supplement should be dismissed in its entirety with the exception of the alleged incident of January 17, 2012.")). Despite Defendants' clarification, the Court will also address the alleged use of force events pertaining to nurse Kimberly Cheasman ("Nurse Cheasman") because Defendants' motion papers allude to at least one of these events and request that all claims alleged against her be dismissed. (*See* Dkt. 59-2 at 63-65). Accordingly, the Court does not address the assaults allegedly taking place on May 10, 2010, February 21, 2011, March 21, 2011, December 5, 2011, and January 17, 2012, and thus Plaintiff's § 1983 claims for excessive use of force and his common law claims arising from these incidents may proceed.

### 1.    Alleged Use of Excessive Force on March 30, 2010

Plaintiff alleges that on March 30, 2010, C.O. Countryman and correctional officer Jacob Smith used excessive force to remove Plaintiff's back brace and to restrain Plaintiff after he protested the manner in which the correctional officers attempted to remove the brace. (Dkt. 46 at ¶¶ 104-06). Both correctional officers allegedly "dragged Plaintiff out of the sick-call room, and violently slammed Plaintiff to the floor face down." (*Id.* at ¶ 107). C.O. Countryman then "tightened the handcuffs on Plaintiff's wrists, twisting both hands and wrists maliciously," and then "twisted Plaintiff's legs, causing extreme pain and suffering to Plaintiff's body, legs and back." (*Id.* at ¶¶ 108-09). C.O. Countryman then "shoved and pushed Plaintiff into a wall," and then he, correctional officer Richard Cioffa, and other unidentified correctional officers "took Plaintiff's back brace violently from his body. . . ." (*Id.* at ¶ 110).

A review of the medical evidence reveals that the medical staff did not observe any injuries subsequent to the alleged assault. Although Plaintiff complained of pain in his arm, face, and wrist, no visible injuries, edema, or redness were observed ten minutes after the use of force occurred. (*See* Dkt. 59-10 at 134-35). Plaintiff made similar complaints the following day, but no swelling or any deformity was noted; nonetheless, the medical staff prescribed Motrin to relieve any discomfort. (*Id.* at 134).

However, the Court does not require corroborating medical evidence demonstrating the presence of an injury to conclude that an excessive force claim survives summary judgment. *See Ninortey v. Shova*, No. 05 CIV. 542 (SHS), 2008 WL 4067107, at *12 (S.D.N.Y. Sept. 2, 2008) (noting that courts in the Southern District of New York "have

not required that injuries caused by the alleged use of excessive force be corroborated by medical records"); *Beckles v. Bennett*, No. 05 CIV. 2000 (JSR), 2008 WL 821827, at *16 (S.D.N.Y. Mar. 26, 2008) (denying summary judgment even though "the nurse noted no sign of physical injury after the incident," where "the medical records provided by [the p]laintiff show that he complained repeatedly and consistently about pain to the back and kidney, beginning immediately after the incident and continuing for months"). "Where 'a prisoner's allegations and evidentiary proffers could reasonably, if credited, allow a rational factfinder to find that corrections officers used force maliciously and sadistically,' summary judgment is improper 'even where the plaintiff's evidence of injury [is] slight and the proof of excessive force [is] weak.'" *Clarke v. Anderson*, No. 10-CV-319S, 2012 WL 3292879, at *5 (W.D.N.Y. Aug. 10, 2012) (quoting *Wright v. Goord*, 554 F.3d 255, 269 (2d Cir. 2009)). "[T]he absence of visible injuries does not mean . . . that [the p]laintiff was not harmed," and thus, "the records, standing alone, are not sufficient to permit the Court to conclude as a matter of law that [the p]laintiff was not subjected to the excessive use of force or that he suffered only *de minimis* injuries." *Ninortey*, 2008 WL 4067107, at *12; *see also United States v. Walsh*, 194 F.3d 37, 50 (2d Cir. 1999) (finding that the prisoner's pain resulting from the force used demonstrates a sufficient injury); *Campbell v. City of New York*, No. 06 CV 5743 (HB), 2010 WL 2720589, at *8 (S.D.N.Y. June 30, 2010) ("That there is at best limited medical evidence in the record to corroborate [the plaintiff's] story is insufficient to dismiss his excessive force claim as a matter of law.").

Furthermore, a "plaintiff's injuries are but one factor to consider in the excessive force analysis." *Cole v. N.Y. State Dep't of Corr. & Cmty. Supervision*, No. 9:14-CV-0539

(BKS/DEP), 2016 WL 5394752, at \*12 (N.D.N.Y. Aug. 25, 2016), *report and recommendation adopted*, 2016 WL 5374125 (N.D.N.Y. Sept. 26, 2016); *see also Dellamore v. Stenros*, 886 F. Supp. 349, 352 (S.D.N.Y. 1995) (rejecting the argument that the excessive force claim should be dismissed because the plaintiff's "medical records do not show any injuries from the use of an alleged chokehold," and explaining that "if a chokehold was used, the fact that it did not cause any physical injuries goes to the amount of damages, if any, to which [the plaintiff] may be entitled, rather than the legal sufficiency of his allegation"). Indeed, Defendants do not appear to dispute the fact that some force was used to restrain Plaintiff on March 30, 2010, nor do they argue that the amount of force used was appropriate to maintain order and discipline. Instead, Defendants simply contend that any injury sustained was *de minimis* in the absence of substantiating medical proof. (*See* Dkt. 59-2 at 50-51). That Plaintiff's primary source of proof may be his own testimony does not mean there are no material issues of fact as to the circumstances underlying the force used and whether such force was maliciously and sadistically applied. *See Griffin*, 193 F.3d at 91 (reversing the dismissal of an excessive force claim, even though the plaintiff's evidence was "extremely thin" and "the only evidence he intended to offer in support of his claims was his own testimony and that the only injuries he suffered were a bruised shin and swelling"); *see also Jordan v. Fischer*, 773 F. Supp. 2d 255, 272 (N.D.N.Y. 2011) (denying a motion for summary judgment where the "plaintiff's excessive force claim will turn on issues of credibility").

Therefore, Defendants' motion for summary judgment is denied insofar as it seeks dismissal of Plaintiff's Eighth Amendment excessive force claim arising out of the incident taking place on March 30, 2010.

## 2. Alleged Use of Excessive Force on November 21, 2010

Plaintiff alleges that on November 21, 2010, Nurse Cheasman was informed that Plaintiff had filed grievances and complaints against her. (Dkt. 46 at ¶ 212). After being so advised, Nurse Cheasman approached Plaintiff's cell, "opened the window panel of the solid door," and proceeded to "physically assault[] Plaintiff with a bucket, injuring Plaintiff's fingers and hands." (*Id.*).

Plaintiff's medical records indicate that he complained of hand pain for several medical visits subsequent to the alleged assault; however, no injuries were ever discerned and Plaintiff was always found to have full use of his hands. (*See* Dkt. 59-10 at 107-08, 110). On November 22, 2010, Plaintiff specifically informed medical staff that he had been assaulted by the "log nurse" with a "medical bucket." (*Id.* at 110). However, the progress notes also reveal that Plaintiff "refused to unwrap hands and show this nurse any injuries." (*Id.*). Defendants argue that Plaintiff's assertion that Nurse Cheasman assaulted him is "far too vague to make out a claim to which any Defendant can respond." (Dkt. 59-2 at 64).

The fact that Plaintiff's medical records suggest that he suffered no visible injury to his fingers, and that he had no difficulty moving his fingers, does not wholly contradict Plaintiff's sworn allegations that he was assaulted by Nurse Cheasman in a manner that was unrelated to the maintenance of prison discipline and order. Indeed, Plaintiff's medical

- 39 -

records indicate that he continued to complain of hand pain for several subsequent medical visits, and that he specifically stated that a nurse had struck him with a bucket. Although Nurse Cheasman has affirmed that she never acted "wantonly or willfully against Plaintiff" and never sought to harm him (*see* Dkt. 59-4 at ¶¶ 24-25), Defendants' reliance upon Plaintiff's medical records fails to establish their entitlement to judgment as a matter of law, *see Abascal v. Fleckenstein*, No. 06-CV-349S, 2012 WL 638977, at \*6 (W.D.N.Y. Feb. 27, 2012) (denying summary judgment where the plaintiff alleged that the correctional officer committed a brief, yet unprovoked assault, "unrelated to any effort to maintain or restore discipline," despite having only resulted in a minor injury); *see also Cole*, 2016 WL 5394752, at \*11 (acknowledging that "a court must ask whether the alleged wrongdoing is objectively harmful enough to establish a constitutional violation," but recognizing that "when prison officials use force to cause harm maliciously and sadistically, contemporary standards of decency always are violated . . . whether or not significant injury is evident" (quoting *Wright*, 554 F.3d at 268-69)); *see generally Breen v. Garrison*, 169 F.3d 152, 153 (2d Cir. 1999) ("Where the parties' versions of facts differed markedly, '[t]he issue of excessive force was . . . for the jury, whose unique task it was to determine the amount of excessive force used, the seriousness of the injuries, and the objective reasonableness of the officer's conduct.'").

Therefore, Defendants' motion for summary judgment is denied insofar as it seeks dismissal of Plaintiff's Eighth Amendment excessive force claim arising out of the incident taking place on November 21, 2010.

### 3. Alleged Use of Excessive Force on December 18, 2010

Plaintiff alleges that on December 18, 2010, Nurse Cheasman assaulted him by "slamming the hatch of Plaintiff's cell door on Plaintiff's left arm when Plaintiff was attempting to retrieve a cup that contained [his] medications." (Dkt. 46 at ¶ 247). However, a review of Plaintiff's medical records over the days that followed this alleged incident reveals that he did not complain of any pain in his left arm and was only treated for a sore throat. (Dkt. 59-10 at 100). The Court recognizes that there is authority supporting the proposition that "where undisputed medical records '*directly and irrefutably* contradict a plaintiff's descriptions of his injuries' attributed to an alleged use of excessive force, 'no reasonable jury could credit plaintiff's account of the happening.'" *Henry v. Brown*, No. 14-CV-2828 (LDH)(LB), 2016 WL 3079798, at *2 (E.D.N.Y. May 27, 2016) (quoting *Davis v. Klein*, No. 11-CV-4868 ENV, 2013 WL 5780475, at *1 (E.D.N.Y. Oct. 25, 2013)); *see also Felder v. Diebel*, No. 10-CV-343 JTC, 2012 WL 6690239, at *5 (W.D.N.Y. Dec. 21, 2012) (finding that the plaintiff's "medical records . . . indicate no signs of injuries consistent with his allegations and no medical treatment," and concluding that "the amount of force used in this case was *de minimis*").

Nonetheless, the instant matter presents the unique scenario where a medical staff member is charged with the use of excessive force. Under these circumstances, the person alleged to have committed the unconstitutional act is potentially also responsible for recording and maintaining the very progress notes relied upon by Defendants in arguing that any amount of force used must have been *de minimis*. The Court cannot decipher the identity of the medical personnel who recorded the progress notes relevant to the December

18, 2010, incident simply by reading the signature transcribed therein. Put another way, Defendants have failed to provide a persuasive reason to dissociate Nurse Cheasman, a member of the medical staff, from the rest of the medical personnel charged with recording and maintaining the medical progress notes at issue.[16] As a result, Defendants have not carried their burden of demonstrating the absence of a triable issue of fact regarding the excessive force claims asserted against Nurse Cheasman.

Therefore, Defendants' motion for summary judgment is denied insofar as it seeks dismissal of Plaintiff's Eighth Amendment excessive force claim arising out of the incident taking place on December 18, 2010.

### 4.     Alleged Use of Excessive Force on September 27, 2011

Plaintiff alleges that on September 27, 2011, C.O. Countryman violently assaulted him in the presence of Nurse Holm, Dr. Weinstock, and correctional sergeant Remy

---

[16]     This observation differs from general claims that medical personnel falsified medical records to minimize any injuries or illnesses. Such speculation is insufficient to defeat a motion for summary judgment. *See, e.g., Slater v. Lacapriccia*, No. 13-CV-1079S, 2018 WL 437931, at *6 n.8 (W.D.N.Y. Jan. 16, 2018) ("Slater contends that [the d]efendants and other medical providers falsified his medical records by not accurately recording his complaints and minimizing his conditions. But Slater has presented no evidence to support this allegation, which is essentially a denial of [the d]efendants' evidence." (citation omitted)). Here, because Nurse Cheasman is alleged to have herself committed an act of excessive force against Plaintiff—and because the Court is required to view Plaintiff's sworn allegations in the light most favorable to him—the Court is not prepared to give dispositive weight to the very medical progress notes that Nurse Cheasman is arguably tasked with maintaining. In other words, Defendants cannot simply point to the absence of any medical evidence where those same medical records are kept and maintained by the person charged with the use of unconstitutional force. This is, by itself, insufficient to carry Defendants' burden on a motion for summary judgment.

Babineaux ("Sgt. Babineaux"). (Dkt. 93-5 at ¶ 34). Plaintiff has submitted use of force reports that were completed after the alleged incident took place. (*See, e.g.*, Dkt. 93-6 at 7). Furthermore, the medical records indicate that force was used to restrain Plaintiff, and that he sustained minor injuries. (Dkt. 59-10 at 44). Clearly some degree of force was used on this occasion, and thus, questions of fact exist as to "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Hudson*, 503 U.S. at 7; *see Henry v. City of New York*, No. 02 Civ. 4824, at \*6, 2003 WL 22077469 (S.D.N.Y. Sept. 8, 2003) ("[W]here there is a factual dispute about the circumstances surrounding . . . the degree of force used, the Second Circuit requires a jury determination of the reasonableness of that force."). Therefore, Defendants' motion for summary judgment is denied to the extent it seeks to dismiss any excessive force claim arising from the events taking place on September 27, 2011.

### E. Other Eighth Amendment Claims

To the extent Plaintiff's allegations also raise several other claims falling within the broader category of "cruel and unusual punishment," those claims are dismissed—with one exception, related to lighting as discussed below. For example, Plaintiff alleges that he was only provided with one clean bed sheet instead of two clean bed sheets for two weeks. (Dkt. 46 at ¶¶ 339-40). However, "such a temporary and minimal deprivation is *de minimus* at best, and as such does not rise to constitutional proportions." *Ahlers v. Nowicki*, No. 9:12-CV-0539 (DNH/RFT), 2014 WL 1056935, at \*5 (N.D.N.Y. Mar. 18, 2014) (where the plaintiff claimed "he was forced to sleep on dirty sheets for approximately four nights"). In addition, Plaintiff alleges that he was not afforded adequate access to certain

reading materials and the general library cart while he was housed in the SHU (Dkt. 46 at ¶ 202), but this assertion fails to state an Eighth Amendment claim, *see Lunney v. Brureton*, No. 04 Civ. 2438 LAK GWG, 2005 WL 121720, at *9 (S.D.N.Y. Jan. 21, 2005) (rejecting the plaintiff's claim that "the general library court was not 'properly stocked' as it was 'void of magazines, newspapers and periodicals' . . . because magazines, newspapers and periodicals are not considered one of life's 'basic necessities' within the meaning of the Eighth Amendment" (collecting cases)), *report and recommendation adopted*, 2005 WL 433285 (S.D.N.Y. Feb. 23, 2005).

Although Plaintiff sets forth general and conclusory allegations that he was deprived of recreational privileges (Dkt. 46 at ¶¶ 443, 459), he only once specifically alleges that correctional officer Eric Farley ("C.O. Farley") actually "denied [him] his daily access to the recreation yard for three days" (*id.* at ¶ 297). "Because exercise is one of the basic human needs protected by the Eighth Amendment, a plaintiff may prevail on an Eighth Amendment claim for deprivation of exercise by alleging that defendants were deliberately indifferent to a sufficiently serious deprivation of exercise." *Dillon v. City of New York*, No. 12 Civ. 6746 (LAP), 2013 WL 3776252, at *3 (S.D.N.Y. July 18, 2013). "However, not every deprivation of exercise amounts to a constitutional violation. Rather, a plaintiff must show that he was denied all meaningful exercise for a substantial period of time." *Williams v. Goord*, 142 F. Supp. 2d 416, 425 (S.D.N.Y. 2001). Assuming C.O. Farley denied Plaintiff recreational access for three days, such a minor deprivation of these privileges does not state a viable Eighth Amendment cause of action. *See Davidson v. Coughlin*, 968 F. Supp. 121, 131 (S.D.N.Y. 1997) (finding that the denial of "all outdoor

exercise" for "fourteen days in a row" does not "implicate Eighth Amendment concerns"); *Chapple v. Coughlin*, 92 CIV. 8629 (TPG), 1996 WL 507323, at *2 (S.D.N.Y. Sept. 5, 1996) (finding that the deprivation of recreational privileges for three days does not violate the Eighth Amendment); *see also Calderon v. Wheeler*, No. 9:06-CV-0963 (GTS/DEP), 2009 WL 2252241, at *14 (N.D.N.Y. July 28, 2009) ("Deprivations of exercise for limited periods have been found in several instances not to support a constitutional claim under the Eighth Amendment."); *Ford v. Phillips*, No. 05 CIV. 6646 (NRB), 2007 WL 946703, at *9 (S.D.N.Y. Mar. 27, 2007) ("[A]s a matter of law, minor and temporary deprivations of property, showers and recreation do not violate the Eighth Amendment."); *Hattley v. Goord*, No. 02Civ.2339(WHP)(RLE), 2003 WL 1700435, at *8 (S.D.N.Y. Mar. 27, 2003) (noting that one hour of recreation per day and 23 hours of confinement "are the normal conditions of an SHU").

Plaintiff also makes various allegations regarding the lighting conditions at Five Points. In particular, Plaintiff alleges that he was subject to 24-hour illumination of his prison cell on several occasions. (*See, e.g.*, Dkt. 46 at ¶¶ 208, 273, 281). "Requiring inmates to live in constant illumination can[,] . . . under certain circumstances, rise to the level of an Eighth Amendment violation." *Jones v. Rock*, No. 9:12-CV-0447 (NAM/TWD), 2013 WL 4804500, at *10 (N.D.N.Y. Sept. 6, 2013); *see Holmes v. Fischer*, No. 09-CV-00829S(F), 2016 WL 552962, at *17 (W.D.N.Y. Feb. 10, 2016) (same). "Indeed, the Second Circuit has recognized that sleep deprivation due to constant illumination can be [a] sufficiently serious condition[] that jeopardizes a prisoner's health." *Collins v. Fischer*, No. 15-CV-103 (KMK), 2018 WL 1626528, at *6 (S.D.N.Y. Mar. 30,

2018) (citing *Walker v. Schult*, 717 F.3d 119, 126 (2d Cir. 2013) ("[S]leep is critical to human existence, and conditions that prevent sleep have been held to violate the Eighth Amendment.")). "Nevertheless, 'to succeed on a claim of illegal illumination, [a] plaintiff must produce evidence that the constant illumination had harmful effects on his health beyond mere discomfort.'" *Holmes*, 2016 WL 552962, at \*17 (quoting *Vasquez v. Frank*, No. 05-C-528-C, 2007 WL 3254702, at \*5 (W.D. Wis. Nov. 2, 2007), *aff'd*, 290 F. App'x 927 (7th Cir. 2008)).

Plaintiff alleges that the constant illumination of his prison cell caused him to suffer eye problems, headaches, sleeplessness, and depression. (*See, e.g.*, Dkt. 46 at ¶¶ 181, 191, 208, 256, 281). In particular, he alleges three specific occasions where his prison cell was illuminated for extended durations. Plaintiff asserts that C.O. Farley ordered the "light to remain on in [his] cell" for an unspecified period of time on October 1, 2010, and that correctional lieutenant Charles Coventry ("Lieutenant Coventry") kept his cell light on "for approximately 24 hours" on November 11, 2010. (*See id.* at ¶¶ 191, 208). Notably, Plaintiff further alleges that on January 14, 2011, C.O. Farley "altered his cell light so that it remained on 24 hours a day" (*id.* at ¶ 273), causing Plaintiff to be "unable to sleep for close to two weeks because his cell light was on day and night" (*id.* at ¶ 274).

"The decisions evaluating Eighth Amendment claims based on continuous lighting in the prison setting are very 'fact-driven,' generally turning on the degree of illumination, the duration of the inmate's exposure, the extent of harm it causes, and the penological justification for the lighting." *Quick v. Graham*, No. 9:12-CV-1717 (DNH/ATB), 2016 WL 873853, at \*5 (N.D.N.Y. Jan. 8, 2016) (quoting *Booker v. Maly*, No. 9:12-CV-246

(NAM/ATB), 2014 WL 1289579, at *18-19 (N.D.N.Y. Mar. 31, 2014), *aff'd*, 590 F. App'x 82 (2d Cir. 2015)), *report and recommendation adopted*, 2016 WL 879310 (N.D.N.Y. Mar. 7, 2016), *vacated* (Mar. 7, 2016), *and report and recommendation adopted*, 2016 WL 1261107 (N.D.N.Y. Mar. 30, 2016). Defendants have not submitted any evidence disputing the fact that Plaintiff was subjected to periods of 24-hour prison cell illumination. Instead, Defendants argue that Plaintiff has failed to set forth any injury caused by these lighting conditions that rises to the level of an Eighth Amendment violation. (*See* Dkt. 59-2 at 33-34). In several cases where summary judgment was deemed appropriate, the court relied upon the low wattage of the light bulbs illuminating the inmate's prison cell. *See, e.g.*, *Booker*, 2014 WL 1289579, at *18 & n.27 (noting that "a 3-watt LED bulb is much less bright than the 9 or 13-watt illumination that was found acceptable" in other cases); *McGee v. Gold*, No. 1:04-CV-335, 2010 WL 5300805, at *5 (D. Vt. Aug. 3, 2010) ("The record indicates that Vermont prisons are using compact fluorescent lighting between 5 and 8 watts, fluorescent bulbs between 7 and 8 watts, and 10-watt incandescent bulbs. These intensities are in a range that courts have generally found permissible under the Constitution." (collecting cases)) (footnote omitted), *report and recommendation adopted sub nom. McGee v. Pallito*, No. 1:04-CV-00335, 2010 WL 5389996 (D. Vt. Dec. 20, 2010), *vacated on other grounds and remanded sub nom. Kimber v. Tallon*, 556 F. App'x 27 (2d Cir. 2014) (finding class counsel's representation deficient). By contrast, Defendants have not provided any indication of the intensity of the cell lights installed at Five Points.

The Court recognizes that Plaintiff's medical records disclose very little to suggest that his cell lights caused any alleged ailments. Nevertheless, Plaintiff appears to have complained of blurry or impaired vision on several occasions (*see, e.g.*, Dkt. 59-10 at 2-3, 48, 59, 108, 112), and he associated these symptoms with his cell lights at least twice, indicating that the "lights hurt[] his eyes," and that the "lights . . . annoy me" (*id.* at 50, 99). In fact, Plaintiff lodged the former complaint on January 16, 2011, just two days after C.O. Farley allegedly "altered his cell light so that it remained on 24 hours a day." (Dkt. 46 at ¶ 273; Dkt. 59-10 at 50). Although other causes could have resulted in or at least contributed to Plaintiff's alleged sleeplessness and eye problems, Defendants have failed to submit evidence supporting such a conclusion on their motion. *Cf. McGee*, 2010 WL 5300805, at *7 ("The affidavit of Dr. Burroughs-Biron establishes that there are a number of potential causes for the symptoms being alleged."). Furthermore, in the absence of evidence demonstrating the intensity of the lighting or the need for such illumination to sustain a secure prison environment, the fact that Plaintiff's medical records do not conclusively establish that his injuries were caused by the prison cell lights is not determinative. *Cf. Huertas v. Sec'y Penn. Dep't of Corr.*, 533 F. App'x 64, 68 & n.7 (3d Cir. 2013) (noting that the plaintiff failed to provide "competent medical evidence" demonstrating that his injuries were caused "because of the lighting" conditions, but relying on the defendants' explanation "that the constant illumination is required for security purposes" and the lack of evidence that "the lights were kept on for any impermissible purpose" in affirming summary judgment); *Tafari v. McCarthy*, 714 F. Supp. 2d 317, 368 (N.D.N.Y. 2010) (distinguishing case law where the defendants "failed

to cite any legitimate penological justification for their conduct" and relying on record submissions regarding safety and security concerns to grant summary judgment on the plaintiff's "retaliatory lighting" claim).

Therefore, because Plaintiff alleges that he suffered periods of 24-hour illumination of his prison cell, which resulted in headaches, eye problems, depression, and the inability "to sleep for close to two weeks" (Dkt. 46 at ¶ 274; *see id.* at ¶¶ 181, 191, 208, 256, 273, 281), in the absence of admissible evidence refuting these sworn statements, Defendants have failed to establish their entitlement to judgment as a matter of law, *see Keenan v. Hall*, 83 F.3d 1083, 1091 (9th Cir. 1996) (denying summary judgment, despite the defendants' supporting evidence to the contrary, where the plaintiff "alleged that large florescent lights directly in front of and behind his cell shone into his cell 24 hours a day, so that his cell was 'constantly illuminated, and [he] had no way of telling night or day,' and that this condition caused him 'grave sleeping problems' and other mental and psychological problems"), *opinion amended on denial of reh'g*, 135 F.3d 1318 (9th Cir. 1998); *cf. Murray v. Edwards Cty. Sheriff's Dep't*, 248 F. App'x 993, 998 (10th Cir. 2007) (distinguishing *Keenan* because the plaintiff's "own testimony indicated that the lights *only sometimes* disturbed his sleep and that he suffered headaches as a result of his loss of sleep *only every now and then*") (emphases added).    Accordingly, Plaintiff's Eighth Amendment conditions-of-confinement claim for the unlawful illumination of his prison cell may proceed against C.O. Farley and Lieutenant Coventry.

Plaintiff further asserts that various correctional officials allegedly entered his prison cell and unlawfully searched his materials on several occasions. (Dkt. 46 at ¶¶ 130,

183-84, 218, 273, 436). However, Plaintiff does not appear to allege that any of these searches occurred with greater frequency than twice in a single month. *See Lashley v. Wakefield*, 367 F. Supp. 2d 461, 471 (W.D.N.Y. 2005) ("The number of searches during the five or six month time period is not excessive, in light of the policy at Five Points that cells are searched once or twice a month."); *Little v. Mun. Corp.*, 51 F. Supp. 3d 473, 498 (S.D.N.Y. 2014) ("[T]he three searches specifically alleged, as well as the general allegation that Plaintiffs were subject to 'intense discriminatory search[e]s,['] are insufficient to satisfy the objective element of an Eighth Amendment claim."). Plaintiff's conclusory assertions that the searches took place "without cause" and "to harass" Plaintiff are insufficient to raise a triable issue of fact, and thus, Defendants are granted summary judgment on this claim as well. *Polk v. Olles*, No. 12-CV-01106S(F), 2015 WL 10381751, at *8 (W.D.N.Y. Dec. 29, 2015) ("Plaintiff offers only conclusory assertions in support of his position that the cell search was other than a routine random search, which statements are insufficient to avoid summary judgment."), *report and recommendation adopted*, 2016 WL 777313 (W.D.N.Y. Feb. 29, 2016).

## V.     Plaintiff's Common Law Causes of Action

Plaintiff has also asserted common law causes of action for assault, battery, intentional infliction of emotional distress, negligent infliction of emotional distress, and false imprisonment. (Dkt. 46 at 99-101). Defendants have not set forth specific arguments addressing these claims. While assault and battery claims are treated similarly to a Fourth Amendment excessive force claim, *see Kavazanjian v. Rice*, No. 03-CV-1923 (FB) (SMG), 2008 WL 5340988, at *7 (E.D.N.Y. Dec. 22, 2008) ("[I]n effect, 'the test for whether a

plaintiff can maintain [a state-law assault-and-battery] cause of action against law enforcement officials is . . . the exact same test as the one used to analyze a Fourth Amendment excessive force claim.'" (quoting *Hogan v. Franco*, 896 F. Supp. 1313, 1315 n.2 (N.D.N.Y. 1995))), an Eighth Amendment excessive force claim is not so analytically aligned with its common law counterparts, *see Davidson v. Brzezniak*, No. 95-CV-00204-RJA, 2011 WL 3236209, at *13 (W.D.N.Y. July 28, 2011) ("Although there is some overlap between the standards for assessing a prison official's liability for assault and battery under the common law and liability under the Eighth Amendment for use of excessive force, the standards are not identical."); *Dufort v. Burgos*, No. 04-CV-4940 (FB) (LB), 2005 WL 2660384, at *2 (E.D.N.Y. Oct. 18, 2005) (same). As Judge Friendly explained several decades ago:

> Certainly the constitutional protection [of the cruel and unusual punishment clause] is nowhere nearly so extensive as that afforded by the common law tort action for battery, which makes actionable any intentional and unpermitted contact with the plaintiff's person or anything attached to it and practically identified with it; still less is it as extensive as that afforded by the common law tort action for assault[.]

*Johnson v. Glick*, 481 F.2d 1028, 1033 (2d Cir. 1973) (citation omitted), *rejected on other grounds by Graham v. Connor*, 490 U.S. 386 (1989); *see also Hernandez v. Lattimore*, 612 F.2d 61, 67 (2d Cir. 1979) ("Just as malpractice does not become a constitutional violation merely because the victim is a prisoner, so, too, not every assault and battery gives rise to a cause of action under the Eighth Amendment because the victim happens to be a prisoner." (citation omitted)).

Since Defendants have set forth no specific arguments addressing any of these distinct causes of action, Defendants have failed to carry their burden of demonstrating their entitlement to judgment as a matter of law, and thus, Plaintiff's common law claims may proceed. *See, e.g.*, *Guzman v. Sposato*, No. 13-CV-6829 (JMA) (AYS), 2018 WL 1597395, at *5 (E.D.N.Y. Mar. 31, 2018) (stating that while the defendants "have . . . moved for summary judgment based on qualified immunity," they have "not offered any specific argument as to why they are entitled to qualified immunity as to the excessive force claims," and concluding that the plaintiff's excessive force claims survive summary judgment); *Shao v. City Univ. of N.Y.*, No. 12-CV-1566 (RJS), 2014 WL 5038389, at *6 (S.D.N.Y. Sept. 30, 2014) (stating that while the defendants "purport to seek summary judgment with respect to all of [the p]laintiff's claims, [the d]efendants do not specifically address [the p]laintiff's hostile work environment claim in either their opening brief or reply brief," and finding that the defendants have failed to demonstrate that they are entitled to judgment as a matter of law on that claim); *Frederick v. Sheahan*, No. 6:10-CV-6527 (MAT), 2014 WL 3748587, at *9 (W.D.N.Y. July 29, 2014) ("At this juncture, the Court declines to grant summary judgment in Sgt. Holton's favor as to this claim, since he did not specifically address or move to dismiss the failure to supervise claim."); *see also Sprott v. Franco*, No. 94 Civ. 3818 (PKL), 1997 WL 79813, at *1 n.1 (S.D.N.Y. Feb. 25, 1997) (noting that the defendants "do not specifically argue for summary judgment with respect to plaintiff's § 1981 claim in their notice of motion or in their supporting memorandum of law," and stating that "[t]he Court will not consider this issue without the benefit of briefing from the parties"); *see generally Adeghe v. Janssen Pharm., Inc.*, No. 16 CIV. 2235 (LGS),

2017 WL 4839063, at *2 (S.D.N.Y. Oct. 24, 2017) (noting that the defendant "made no particularized arguments" as to certain claims in its initial motion for summary judgment and finding that the defendant's "new arguments to support summary judgment on the claims it had neglected to specifically address in its initial briefing . . . need not be considered" on its motion for reconsideration).

## VI.  First Amendment Retaliation Claims

Because of the "near inevitability of decisions and actions by prison officials to which prisoners will take exception and the ease with which claims of retaliation may be fabricated, [courts in this Circuit] examine prisoners' claims of retaliation with skepticism and particular care." *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995); *see Khudan v. Lee*, No. 12-CV-8147 (RJS), 2016 WL 4735364, at *6 (S.D.N.Y. Sept. 8, 2016) ("Courts generally review claims of 'retaliation by prisoners "with skepticism" because of the ease with which a retaliation claim may be fabricated.'" (quoting *Bolton v. City of New York*, No. 13-CV-5749 RJS, 2015 WL 1822008, at *2 (S.D.N.Y. Apr. 20, 2015))), *app. dismissed*, No. 16-3534, 2016 WL 10100723 (2d Cir. Dec. 8, 2016). Accordingly, retaliation claims must "be 'supported by specific and detailed factual allegations,' not stated 'in wholly conclusory terms.'" *Dolan v. Connolly*, 794 F.3d 290, 295 (2d Cir. 2015) (quoting *Flaherty v. Coughlin*, 713 F.2d 10, 13 (2d Cir. 1983), *overruled on other grounds by Swierkiewicz v. Sorema N. A.*, 534 U.S. 506 (2002)).

To the extent Plaintiff alleges that certain defendants falsified his medical records or omitted certain information from them (*see, e.g.*, Dkt. 46 at ¶¶ 150, 156, 224, 233, 306-07, 313, 329), those allegations, standing alone, do not provide a basis to support a

§ 1983 cause of action, *see Micolo v. Fuller*, No. 6:15-CV-06374(MAT), 2016 WL 6404146, at \*3 (W.D.N.Y. Oct. 28, 2016) (noting that "the only omission attributed to Jones is a failure to record all of [the p]laintiff's alleged injuries in the treatment note" and stating that "this alleged omission does not amount to a constitutional violation"); *Williams v. Bentivegna*, No. 14-CV-6105-CJS, 2015 WL 162994, at \*7 (W.D.N.Y. Jan. 13, 2015) ("Williams' complaints that prescribed medication was not provided to him, or that the doctors wrote false information in his medical record, might amount to malpractice, but not a constitutional violation."); *see also Crenshaw v. Hartman*, 681 F. Supp. 2d 412, 415 (W.D.N.Y. 2010) ("The law is clear that 'the issuance of false misbehavior reports against an inmate by corrections officers is insufficient on its own to establish a denial of due process.'" (quoting *Sital v. Burgio*, 592 F. Supp. 2d 355, 357 (W.D.N.Y. 2009))). Nonetheless, "[a] prisoner may be able to state a constitutional claim by alleging facts indicating that false charges were brought against him in retaliation for the prisoner's exercise of a constitutionally protected right, such as the filing of grievances." *Crenshaw*, 681 F. Supp. 2d at 415.

To prevail on a First Amendment retaliation claim, a prisoner must demonstrate that: "(1) he engaged in protected speech or activity; (2) the defendant took adverse action against him; and (3) there was a causal connection between the protected speech or activity and the adverse action." *Simmons v. Adamy*, 987 F. Supp. 2d 302, 306 (W.D.N.Y. 2013) (citing *Espinal v. Goord*, 558 F.3d 119, 227 (2d Cir. 2009)).

Plaintiff alleges that several correctional officers filed false misbehavior reports against him in retaliation for his filing of grievances against them, and that certain medical

personnel denied him appropriate care and medications in retaliation for the grievances he filed against them as well. (*See, e.g.*, Dkt. 46 at ¶¶ 215, 220, 272, 279, 328, 418, 420, 422, 424, 428, 430, 432, 434, 436, 438, 440, 442, 445, 450, 453, 456). "Because the filing of prison grievances is a protected activity, Plaintiff meets the first prong of the test." *Nelson v. McGrain*, No. 6:12-CV-6292 (MAT), 2015 WL 7571911, at *1 (W.D.N.Y. Nov. 24, 2015) (citation omitted). "The Second Circuit has defined 'adverse action' in the prison context as 'retaliatory conduct "that would deter a similarly situated individual of ordinary firmness from exercising . . . constitutional rights."'" *Adams v. Rock*, No. 9:12-CV-1400 (GLS/ATB), 2015 WL 1312738, at *10 (N.D.N.Y. Mar. 24, 2015) (quoting *Gill v. Pidlypchak*, 389 F.3d 379, 381 (2d Cir. 2004)). "[C]ourts have found that 'denial of medical evaluation, treatment, and adequate pain medication' can suffice to establish adverse action under a First Amendment retaliation analysis." *Castro v. Heath*, No. 9:12-CV-01250 (MAD), 2013 WL 5354241, at *10 (N.D.N.Y. Sept. 23, 2013) (quoting *Burton v. Lynch*, 664 F. Supp. 2d 349, 366 (S.D.N.Y. 2009)); *see Williams v. Fisher*, No. 02 CIV. 4558(LMM), 2003 WL 22170610, at *11 (S.D.N.Y. Sept. 18, 2003) (finding the second element satisfied where the plaintiff alleged that medical staff revoked a "necessary medical rehabilitative treatment" as a result of the filing of a grievance). In addition, "[i]t is well settled that filing . . . a false misbehavior report is an adverse action." *James v. Mosko*, No. 13-CV-5-LJV-MJR, 2016 WL 8671478, at *6 (W.D.N.Y. July 22, 2016) (citation omitted), *report and recommendation adopted*, 2017 WL 397474 (W.D.N.Y. Jan. 30, 2017); *Reed v. Doe No. 1*, No. 9:11-CV-0250 (TJM/DEP), 2012 WL 4486086, at *5 (N.D.N.Y. July 26, 2012) ("The filing of a false misbehavior report can qualify as an

adverse action for purposes of a First Amendment retaliation." (citing *Gill*, 389 F.3d at

384)), *report and recommendation adopted*, 2012 WL 4486085 (N.D.N.Y. Sept. 27, 2012);

*Mateo v. Fischer*, 682 F. Supp. 2d 423, 434 (S.D.N.Y. 2010) ("Filing a false misbehavior

report about Mateo . . . would deter a similarly situated person of ordinary firmness from

exercising his First Amendment rights."). Thus, Plaintiff has also sufficiently alleged an

"adverse action," satisfying the second element of a First Amendment retaliation claim.

However, Plaintiff has failed to raise a triable question of fact as to whether there is

a causal connection between the filing of his grievances and the alleged adverse actions at

issue.

> In determining whether a causal connection exists between the plaintiff's
> protected activity and a prison official's actions, a number of factors may be
> considered, including: (1) the temporal proximity between the protected
> activity and the alleged retaliatory act; (2) the inmate's prior good
> disciplinary record; (3) vindication at a hearing on the matter; and (4)
> statements by the defendant concerning his motivation.

*Bunting v. Conway*, No. 04-CV-0731A (HKS), 2010 WL 5332280, at \*7 (W.D.N.Y. Nov.

1, 2010) (citing *Colon*, 58 F.3d at 872), *report and recommendation adopted*, 2010 WL

5313308 (W.D.N.Y. Dec. 20, 2010).

Given that many of the alleged adverse actions seem to have occurred within weeks

or even days of Plaintiff's grievances, it appears that Plaintiff relies on the temporal

proximity between the filing of his grievances and the alleged retaliatory acts to establish

the necessary causal connection—although Plaintiff's opposition papers do not discuss this

element in any great detail. (*See* Dkt. 93 at 51-54). However, while "the temporal

proximity of the filing of the grievance" and an "adverse action" is "circumstantial

evidence of retaliation, such evidence, without more, is insufficient to survive summary judgment." *Williams*, 111 F. Supp. 2d at 290; *see Ayers v. Stewart*, 101 F.3d 687, 1996 WL 346049 (Table), at *1 (2d Cir. 1996) (stating that the plaintiff's "reliance on circumstantial evidence of retaliation—namely, the proximity of the disciplinary action to his complaint where no misbehavior reports were previously filed against him—does not suffice to defeat summary judgment"); *see also Colon*, 58 F.3d at 873 ("If . . . circumstantial evidence represented the sum total of Colon's proof, we might be inclined to affirm the grant of summary judgment based on the weakness of Colon's case."); *see generally Flaherty*, 713 F.2d at 13 (acknowledging the ease in which a plaintiff may manufacture a claim for retaliation, and stating that summary judgment is appropriate if the claim appears insubstantial). Furthermore, the sheer volume of grievances filed by Plaintiff diminishes the weight attributed to the temporal proximity of any of his retaliatory allegations. (*See* Dkt. 46 at ¶ 408 (alleging that Plaintiff filed about 155 grievances "from March 25, 2010 through June 5, 2011")); *Andino v. Fischer*, 698 F. Supp. 2d 362, 385 (S.D.N.Y. 2010) ("While there is some proximity between the complaints and the alleged adverse actions, this results from the large number of complaints in a short period of time.").

In addition, Plaintiff accumulated a lengthy disciplinary record while incarcerated. It is undisputed that "[b]ecause Plaintiff had accumulated so much SHU time from incidents occurring prior to 2010, he did not serve" an SHU penalty imposed for an incident occurring in May 27, 2010, until over three years later in December 2013. (*See* Dkt. 59-1 at ¶ 22; Dkt. 93-1 at ¶ 22). The fact that Plaintiff was ultimately found guilty of at least

some of the charged conduct asserted in many if not all of the misbehavior reports filed against him (*see* Dkt. 93 at 53; Dkt. 93-5 at ¶ 61; *see also* Dkt. 59-1 at ¶ 19; Dkt. 93-1 at ¶ 19)—and that those findings were subsequently affirmed (*see* Dkt. 93 at 53; Dkt. 93-5 at ¶ 72)—"certainly suggests that there was a valid basis for the issuance of the report, and [P]laintiff's conclusory assertion that it was retaliatory in nature fails to state a plausible claim," *Crenshaw v. Hartman*, 681 F. Supp. 2d 412, 416 (W.D.N.Y. 2010); *see White v. Bergenstock*, No. 9:08-CV-717, 2009 WL 4544390, at *7 (N.D.N.Y. Nov. 25, 2009) (stating that since "the charges in the misbehavior report have never been overturned[,] . . . there is no sufficient allegation that the misbehavior report was false in any material respect"); *Cusamano v. Sobek*, 604 F. Supp. 2d 416, 478 (N.D.N.Y. 2009) (noting that the plaintiff "has alleged that he was ultimately convicted of the disciplinary charge leveled" against him and that "the conviction was affirmed on appeal, plausibly suggesting that what caused him to receive the referenced misbehavior report was his own misconduct"). Furthermore, a large number of Plaintiff's allegations pertaining to the retaliatory conduct purportedly advanced against him are alleged "upon information and belief." (*See, e.g.*, Dkt. 46 at ¶¶ 220, 241, 248, 272, 281, 328, 415, 418, 420, 422, 424, 428, 430, 432, 434, 438, 440, 442, 445, 450, 453, 456). "[C]onclusory allegations 'upon information and belief,' as [P]laintiff advances here, cannot defeat summary judgment." *Little v. Massari*, 526 F. Supp. 2d 371, 376-77 (E.D.N.Y. 2007); *see Estate of Gustafson ex rel. Reginella v. Target Corp.*, 819 F.3d 673, 677 n.4 (2d Cir. 2016) ("The verified answer is stated only '[u]pon information and belief,' rather than on the basis of personal knowledge, and therefore may not be considered in opposition to summary judgment."

(alternation in original) (citation omitted)); *Dellacava v. Painters Pension Fund of Westchester & Putnam Ctys.*, 851 F.2d 22, 26 (2d Cir. 1988) (stating that an explanation based "'upon information and belief' . . . could not have been considered in the summary judgment motion"); *cf. Patterson v. Cty. of Oneida, N.Y.*, 375 F.3d 206, 219 (2d Cir. 2004) ("[A] verified pleading, to the extent that it makes allegations on the basis of the plaintiff's personal knowledge, *and not merely on information and belief,* has the effect of an affidavit and may be relied on to oppose summary judgment." (emphasis added)).

The Court is cognizant of the Second Circuit's instruction to view claims of First Amendment retaliation in this context with care and skepticism given their potential for abuse. *Dawes v. Walker*, 239 F.3d 489, 491 (2d Cir. 2001), *overruled on other grounds by Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002). Certainly, the number of grievances and sick-call requests filed by Plaintiff provide substantial fodder for the manufacture of numerous claims of retaliation. *See generally Davidson v. Bartholome*, 460 F. Supp. 2d 436, 444 (S.D.N.Y. 2006) (noting that the "possibility of abuse" of a retaliation claim is "ever present," but was "especially apparent in the instant case" where the plaintiff had "filed approximately 150 previous lawsuits"). Indeed, in light of Plaintiff's failure to raise a triable issue of fact pertaining to his claim for deliberate medical indifference, as previously discussed, Plaintiff cannot sustain a viable claim for the retaliatory denial of constitutionally adequate medical treatment. *See Bilal v. White*, 494 F. App'x 143, 147 (2d Cir. 2012) ("As for the delay in Bilal's receipt of prescription pain medication, we conclude, for substantially the same reasons that we reject Bilal's Eighth Amendment claim, that the record presented fails to bring Bilal's retaliation claim within 'the ambit of

constitutional protection.'" (quoting *Dawes*, 239 F.3d at 493)); *Vail v. Lashway*, No. 9:12-CV-1245 (GTS/RFT), 2014 WL 4626490, at \*19 (N.D.N.Y. Sept. 15, 2014) (dismissing a retaliation claim where "there is no evidence that [the p]laintiff was ever deprived of adequate medical care," and stating that the court's "conclusion in this regard is, on its own, likely sufficient to grant summary judgment against [the p]laintiff's medical retaliation claims"); *Cole v. Levitt*, No. 07-CV-00767(M), 2009 WL 4571828, at \*10 (W.D.N.Y. Dec. 4, 2009) ("Having concluded that Dr. Levitt was not deliberately indifferent to plaintiff's medical needs, I likewise conclude that there is no evidentiary basis to conclude that her conduct was retaliatory."); *see generally Adams*, 2015 WL 1312738, at \*10 (stating that "[e]ven where a complaint or affidavit contains specific assertions, the allegations may still be deemed conclusory if [they are] . . . largely unsubstantiated by any other direct evidence" (quotation omitted)).

Therefore, for the foregoing reasons, Plaintiff's First Amendment retaliation claim is dismissed.[18]

---

[18] To the extent Plaintiff also alleges that certain correctional officers and medical personnel made hostile remarks or threats against him on various occasions (*see, e.g.*, Dkt. 46 at ¶¶ 145, 164, 212, 215, 225, 248, 286, 288, 348), these allegations fail to give rise to a viable claim for retaliation, *see Roseboro v. Gillespie*, 791 F. Supp. 2d 353, 373 (S.D.N.Y. 2011) (finding that the plaintiff's retaliation "claim fails because an inmate 'has no right to redress simply because [an officer] made a hostile or derogatory comment about him.'" (quoting *Davidson v. Bartholome*, 460 F. Supp. 2d 436, 446 (S.D.N.Y. 2006) (dismissing retaliation cause of action where the defendant "became hostile and began cursing" at the plaintiff and told the plaintiff "that he was going to issue him a 'false' misbehavior ticket"))); *see also Purcell v. Coughlin*, 790 F.2d 263, 265 (2d Cir. 1986) ("The claim that a prison guard called Purcell names also did not allege any appreciable injury and was properly dismissed.").

## VII. Plaintiff's Right to Access to the Courts

"Interference with legal mail implicates a prison inmate's rights to access to the courts and free speech as guaranteed by the First and Fourteenth Amendments to the U.S. Constitution." *Davis v. Goord*, 320 F.3d 346, 351 (2d Cir. 2003). The right of access to the courts "requires state prisons 'to give prisoners a reasonably adequate opportunity to present claimed violations of fundamental constitutional rights to the courts.'" *Bellezza v. Holland*, No. 09 CIV. 8434, 2011 WL 2848141, at *4 (S.D.N.Y. July 12, 2011) (quoting *Bounds v. Smith*, 430 U.S. 817, 825 (1977)). "To state a claim for denial of access to the courts—in this case due to interference with legal mail—a plaintiff must allege that the defendant 'took or was responsible for actions that hindered [a plaintiff's] efforts to pursue a legal claim.'" *Davis*, 320 F.3d at 351 (quoting *Monsky v. Moraghan*, 127 F.3d 243, 247 (2d Cir. 1997)). "[P]risoners who bring a claim for the violation of a derivative right of access to the courts must demonstrate 'actual injury' in order to have standing." *Collins v. Goord*, 581 F. Supp. 2d 563, 573 (S.D.N.Y. 2008). "In other words[,] 'the plaintiff must show that a non-frivolous legal claim had been frustrated or was being impeded due to the actions of prison officials.'" *Cancel v. Goord*, No. 00 CIV 2042 LMM, 2001 WL 303713, at *4 (S.D.N.Y. Mar. 29, 2001) (quoting *Warburton v. Underwood*, 2 F. Supp. 2d 306, 312 (W.D.N.Y. 1998)).

Nowhere in Plaintiff's submissions does he provide factual proof that a non-frivolous legal claim was frustrated due to the alleged interference with his legal mail. Instead, Plaintiff only alleges, in conclusory form, that "[a]s a result of the failure of [certain of his] legal documents to reach the court, Plaintiff's rights were violated in the

associated court proceedings." (Dkt. 46 at ¶ 352). Plaintiff fails to elaborate upon this general allegation in any respect. Accordingly, because Plaintiff has failed to raise a triable issue of fact as to whether he suffered an "actual injury" from any alleged interference with his legal mail, Plaintiff's claim is dismissed.[19]

## VIII. Failure to Provide Kosher Meals in Violation of the First Amendment's Free Exercise Clause

"The Free Exercise Clause of the First Amendment is an 'unflinching pledge to allow our citizenry to explore . . . religious beliefs in accordance with the dictates of their conscience.'" *Jackson v. Mann*, 196 F.3d 316, 320 (2d Cir. 1999) (quoting *Patrick v. LeFevre*, 745 F.2d 153, 157 (2d Cir. 1984)). "Prisoners have long been understood to retain some measure of the constitutional protection afforded by the First Amendment's Free Exercise Clause." *Ford v. McGinnis*, 352 F.3d 582, 588 (2d Cir. 2003); *see Jackson*,

---

[19] To the extent Plaintiff also alleges that he was denied access to the courts due to constitutionally inadequate access to law library resources (*see, e.g.*, Dkt. 46 at ¶¶ 211, 354, 363, 368, 404, 407), this too fails to raise a triable issue of fact because Plaintiff has failed to establish that he suffered an "actual injury" as a result of any of these purported deprivations, *see Benjamin v. Kerik*, 102 F. Supp. 2d 157, 162 (S.D.N.Y. 2000) (noting that the Supreme Court has "held that prisoners do not have a freestanding right to law libraries or legal assistance," and that inmates "must show actual injury" (citing *Lewis v. Casey*, 518 U.S. 343, 353 n.4 (1996) (rejecting "a freestanding right to libraries," and stating that the "[d]enial of access to the courts could not possibly cause the harm of inadequate libraries, but only the harm of lost, rejected, or impeded legal claims"))), *aff'd sub nom. Benjamin v. Fraser*, 264 F.3d 175 (2d Cir. 2001); *see also Smith v. Donaher*, No. 12-CV-6035-CJS, 2013 WL 2531750, at *9 (W.D.N.Y. June 10, 2013) ("Plaintiff was not denied access to the courts merely because of the amount of time that it took to make the copies."); *Muhammad v. Hodge*, No. 07-CV-0232(SR), 2010 WL 1186330, at *5 (W.D.N.Y. Mar. 24, 2010) ("Courts in the Second Circuit have repeatedly held that a prisoner does not have a constitutional right to free copies. . . .").

- 62 -

196 F.3d at 320 ("An inmate is therefore entitled to a reasonable accommodation of his religious beliefs."). "The reach of the free exercise clause extends to 'an inmate's diet and participation in religious meals.'" *Riehl v. Martin*, No. 9:13-CV-439 GLS/TWD, 2014 WL 1289601, at \*8 (N.D.N.Y. Mar. 31, 2014) (quoting *Johnson v. Guiffere*, No. 9:04-CV-57, 2007 WL 3046703, at \*4 (N.D.N.Y. Oct. 17, 2007)); *see Bass v. Coughlin*, 976 F.2d 98, 99 (2d Cir. 1992) ("[P]rison officials must provide a prisoner a diet that is consistent with his religious scruples."). The right to participate in religious meals includes the right to a kosher diet. *See Thaxton v. Simmons*, No. 9:10-CV-1318 MAD/RFT, 2012 WL 360104, at \*5 (N.D.N.Y. Jan. 5, 2012) ("Among those protected rights is the right to receive a kosher diet."), *report and recommendation adopted*, 2012 WL 360141 (N.D.N.Y. Feb. 2, 2012).

"Whether or not brought by prisoners, free exercise claims often test the boundaries of the judiciary's competence, as courts are 'singularly ill-equipped to sit in judgment on the verity of an adherent's religious beliefs.'" *Ford*, 352 F.3d at 588 (quoting *Patrick*, 745 F.2d at 157)). "An individual claiming violation of free exercise rights need only demonstrate that the beliefs professed are 'sincerely held' and in the individual's 'own scheme of things, religious.'" *Fifth Ave. Presbyterian Church v. City of New York*, 293 F.3d 570, 574 (2d Cir. 2002) (quoting *Patrick*, 745 F.2d at 157). However, "scrutiny of the prisoner's sincerity is often essential in 'differentiating between those beliefs that are held as a matter of conscience and those that are animated by motives of deception and fraud.'" *Ford*, 352 F.3d at 588 (quoting *Patrick*, 745 F.2d at 157).

- 63 -

Plaintiff has alleged that his "religious belief is jewish" and that his "religion is jews too." (Dkt. 93-5 at ¶ 87; *see* Dkt. 46 at ¶ 182 (alleging that Plaintiff had informed correctional sergeant T. Barber ("Sgt. Barber") "that he was Jewish")). Plaintiff claims that he was supposed to receive Kosher loaves, but instead he was being fed non-Kosher loaves because Defendants did not care about his religious beliefs. (*See* Dkt. 93-5 at ¶ 103). However, "[n]o where [sic] in the Complaint does Plaintiff allege the sincerity of his beliefs and what role the kosher diet plays therein." *Thaxton*, 2012 WL 360104, at \*6; *see Meadows v. Lesh*, No. 10-CV-00223 M, 2010 WL 3730105, at \*3 (W.D.N.Y. Sept. 17, 2010) (acknowledging that the sincerity of a religious belief is usually a factual issue, but stating that "the complaint must still assert sufficient allegations necessary to establish that plaintiff's claim is based upon a sincerely held religious belief"). Indeed, "[m]ere membership in an established religion is not enough to show that a prisoner has sincerely held religious beliefs." *Thaxton*, 2012 WL 360104, at \*6 (citing *Ford*, 352 F.3d at 588). Although Plaintiff alleges that he was not provided Kosher loaves, he fails to allege that his adherence to a Kosher diet is a "sincerely held" religious belief, nor does he explain why a Kosher diet is important to his religion. *See Woodward v. Ali*, No. 9:13-CV-1304 LEK/RFT, 2015 WL 5711899, at \*8 (N.D.N.Y. Sept. 29, 2015) (noting that the plaintiff "has not explained why the removal of his name from the Ramadan feed-up list and denial of two meals substantially burdened his exercise of religious beliefs" and finding that "in the absence of any admissible facts with respect to [the p]laintiff's personally held beliefs or how [the d]efendants' conduct impacted those beliefs, we find that [the p]laintiff has failed to meet his burden of showing that his professed religious beliefs are sincerely held

and were infringed"); *Turner v. Oakland Police Officers*, No. C 09-03652 SI, 2010 WL 816797, at *4 (N.D. Cal. Mar. 9, 2010) (dismissing the plaintiff's free exercise claim where, "[a]bsent some description of plaintiff's religion, his religious practices, and the role and importance of blessing oil in the religion, it is impossible to determine whether plaintiff's beliefs are sincerely held and whether blessing oil is rooted in that religious belief"); *Evans v. Albany Cty. Corr. Facility*, No. 9:05-CV-1400 GTS/DEP, 2009 WL 1401645, at *8 (N.D.N.Y. May 14, 2009) (granting summary judgment on a free exercise claim where the plaintiff failed to "allege[] or establish[] how receiving non-vegetarian meals infringed on his sincerely held religious beliefs" (citing *Benjamin v. Coughlin*, 905 F.2d 571, 580 (2d Cir. 1990))); *see also Odom v. Dixion*, No. 04-CV-889F, 2008 WL 466255, at *6 (W.D.N.Y. Feb. 15, 2008) (describing a plaintiff's burden of demonstrating his religious beliefs are sincerely held as "a threshold requirement for any religious freedom claim under either the First Amendment or the [Religious Land Use and Institutionalized Persons Act]").

Recognizing that "the issue of sincerity can rarely be determined on summary judgment," *Snyder v. Murray City Corp.*, 124 F.3d 1349, 1353 (10th Cir. 1997), *opinion vacated in part on reh'g en banc on other grounds*, 159 F.3d 1227 (10th Cir. 1998), and that "courts are not permitted to inquire into the centrality of a professed belief to the adherent's religion or to question its validity in determining whether a religious practice exists," *Fifth Ave. Presbyterian Church*, 293 F.3d at 574, the Court nevertheless concludes that Plaintiff has failed to raise a triable issue of fact as to whether his beliefs are sincerely held, *see generally Ochoa v. Connell*, No. 9:05-CV-1068 GLSRFT, 2007 WL 3049889, at

*7 (N.D.N.Y. Oct. 18, 2007) ("Ochoa fails to allege the nature and content of his beliefs, how he came to hold them, and what difference they have made in his life. Ochoa does not describe his participation in other religious activities such as Sabbath observances, dietary strictures, religious meetings, holy feast days, or other significant religious activities to which he purportedly adheres to so that we may comfortably determine that he has pled enough facts to establish that his beliefs are both religious and sincerely held."). Accordingly, Plaintiff's First Amendment Free Exercise Clause claims are dismissed. *See Farid v. Smith*, 850 F.2d 917, 926 (2d Cir. 1988) ("Because Farid has neither alleged nor submitted any proof that he sincerely holds to any religious belief that mandates the use of Tarot cards, we conclude that summary judgment was appropriate on the free exercise claim.").

## IX. Plaintiff's Equal Protection Clause and Section 1985 Causes of Actions

### A. Equal Protection Claim

"The Equal Protection Clause of the Fourteenth Amendment 'is essentially a direction that all persons similarly situated should be treated alike.'" *Barnes v. Ross*, 926 F. Supp. 2d 499, 506 (S.D.N.Y. 2013) (quoting *City of Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 432, 439 (1985)). "In order to prove a violation of the Equal Protection Clause, a plaintiff must demonstrate evidence of 'purposeful discrimination . . . directed at an identifiable or suspect class.'" *Harnage v. Caldonero*, No. 3:16CV1876(AWT), 2017 WL 2190057, at *3 (D. Conn. May 18, 2017) (quoting *Giano v. Senkowski*, 54 F.3d 1050, 1057 (2d Cir. 1995)).

Plaintiff has failed to allege membership in a protected class and has submitted no evidence demonstrating that he was treated disparately from similarly situated individuals. Indeed, it is well-established that "[p]risoners are not a part of a suspect class." *Tavares v. Amato*, 954 F. Supp. 2d 79, 99 (N.D.N.Y. 2013) (citing *Scott v. Dennison*, 739 F. Supp. 2d 342, 362 (W.D.N.Y. 2010)); *see Lee v. Governor of State of N.Y.*, 87 F.3d 55, 60 (2d Cir. 1996) ("[P]risoners either in the aggregate or specified by offense are not a suspect class. . . ."); *see also Harvey v. Harder*, No. 9:09-CV-154 TJM/ATB, 2012 WL 4093792, at *7 n.12 (N.D.N.Y. July 31, 2012) (noting that the assertion of an equal protection claim would be meritless because the plaintiff "has not alleged that any other inmates, similarly situated to plaintiff, were treated differently regarding classification"), *report and recommendation adopted*, 2012 WL 4093760 (N.D.N.Y. Sept. 17, 2012). Plaintiff's allegations of discrimination are based "upon information and belief" and acts of verbal harassment or are otherwise too conclusory to demonstrate a triable issue of fact. (*See, e.g.*, Dkt. 46 at ¶¶ 1, 103, 172, 197, 415); *Giano*, 54 F.3d at 1057 (concluding that the plaintiff's "equal protection claim fails" where he "presents no evidence" of discrimination "against a particular class of inmates"); *see generally DeJesus v. Tierney*, No. 9:04-CV-298, 2006 WL 839541, at *11 (N.D.N.Y. Mar. 28, 2006) (stating that it is "well settled that verbal harassment itself does not rise to the level of a constitutional violation," and that "[v]erbal abuse, vulgarity, and even threats are insufficient to rise to the level of constitutional violations").

"When a plaintiff alleges an equal protection violation (without also alleging discrimination based upon membership in a protected class), the plaintiff must plausibly

allege that he or she has been intentionally treated differently from others similarly situated and no rational basis exists for that different treatment." *Progressive Credit Union v. City of New York*, 889 F.3d 40, 49 (2d Cir. 2018). This category of equal protection violation is commonly known as a "class of one" claim. *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564, (2000). "[C]lass-of-one plaintiffs must show an extremely high degree of similarity between themselves and the persons to whom they compare themselves." *Clubside, Inc. v. Valentin*, 468 F.3d 144, 159 (2d Cir. 2006). In other words, the Plaintiff must be "*prima facie* identical" to the person or persons who have received different treatment. *Neilson v. D'Angelis*, 409 F.3d 100, 105 (2d Cir. 2005) (quotation omitted), *overruled on other grounds by Appel v. Spiridon*, 531 F.3d 138 (2d Cir. 2008).

> Overall, "to succeed on a class-of-one claim, a plaintiff must establish that (i) no rational person could regard the circumstances of the plaintiff to differ from those of a comparator to a degree that would justify the differential treatment on the basis of a legitimate government policy; and (ii) the similarity in circumstances and difference in treatment are sufficient to exclude the possibility that the defendants acted on the basis of a mistake."

*Progressive Credit Union*, 889 F.3d at 49 (quoting *Ruston v. Town Bd. for Skaneateles*, 610 F.3d 55, 59-60 (2d Cir. 2010)).

It is unclear whether Plaintiff has asserted a "class of one" equal protection claim, but to the extent that he has attempted to do so, Plaintiff "has not alleged sufficient facts to show the requisite degree of similarity to" any other inmate. *Harnage*, 2017 WL 2190057, at *3; *see Riley v. Roycroft*, No. 16 CV 2227 (VB), 2017 WL 782917, at *8 (S.D.N.Y. Feb. 28, 2017) (granting motion to dismiss where the plaintiff alleges that he was not given certain medication that "was provided to other inmates with the same medical condition,"

because he "fails to allege facts that demonstrate a substantial similarity between himself and the other inmates with whom he compares himself"); *Rankel v. Town of Somers*, 999 F. Supp. 2d 527, 545 (S.D.N.Y. 2014) (dismissing the plaintiff's "class of one" equal protection claim because he "has provided no facts from which it may be plausibly inferred that . . . any other citizens were similarly situated" and "provides no information about their properties, situations or conduct that would support the conclusory statement that they were similarly (let alone extremely similarly) situated"). In fact, Plaintiff's SAC "does not identify any comparators or similarly situated entities at all," and thus, to the extent Plaintiff raises a "class of one" equal protection claim, it "is deficient as a matter of law." *MacPherson v. Town of Southampton*, 738 F. Supp. 2d 353, 371 (E.D.N.Y. 2010).

## B. Plaintiff's § 1985 Claim

Similarly, Plaintiff's allegations that Defendants unlawfully conspired to violate his constitutional rights in contravention of 42 U.S.C. § 1985(3) also fail to raise a triable issue of fact because "Plaintiff nowhere alleges that he was a victim of a conspiracy due to his membership in some protected class." *Malsh v. Austin*, 901 F. Supp. 757, 764 (S.D.N.Y. 1995). "42 U.S.C. § 1985(3) prohibits conspiracies undertaken 'for the purpose of depriving, either directly or indirectly, any person or class of person of the equal protection of the laws, or of equal privileges or immunities under the laws.'" *Id.* (quoting *Jews for Jesus, Inc. v. Jewish Cmty. Relations Council of N.Y., Inc.*, 968 F.2d 286, 290-91 (2d Cir. 1992)). "Such a claim requires more than simply a showing that the defendants acted jointly to achieve some end, and that they used unlawful means to do so. Instead, plaintiff must show that defendants were motivated by animus toward plaintiff based on his

membership in some protected class." *Robinson v. Allstate*, 706 F. Supp. 2d 320, 328

(W.D.N.Y. 2010) (citations omitted), *aff'd sub nom. Robinson v. Allstate Ins. Co.*, 508 F.

App'x 7 (2d Cir. 2013).

> A conspiracy claim under Section 1985(3) requires a plaintiff to allege: "1)
> a conspiracy; 2) for the purpose of depriving, either directly or indirectly, any
> person or class of persons of the equal protection of the laws, or of equal
> privileges and immunities under the laws; and 3) an act in furtherance of the
> conspiracy; 4) whereby a person is either injured in his person or property or
> deprived of any right or privilege of a citizen of the United States."

*Dolan v. Connolly*, 794 F.3d 290, 296 (2d Cir. 2015) (quoting *Britt v. Garcia*, 457 F.3d

264, 269 n.4 (2d Cir. 2006)).

Because Plaintiff has failed to demonstrate that any conspiracy to violate his

constitutional rights arose due to his membership in a protected class, Plaintiff's § 1985(3)

claim is without merit. In *Katz v. Klehammer*, 902 F.2d 204 (2d Cir. 1990), the Second

Circuit found that the plaintiff's "complaint is completely devoid of any claim of class-

based animus, whether economic, political, or otherwise," and found that the § 1985(3)

claim "was properly dismissed as frivolous." *Id.* at 208 (noting also that the Supreme Court

has "strictly construed" the requirement that plaintiffs demonstrate class-based animus).

"The Supreme Court added a 'class-based animus' requirement to § 1985(3) to prevent it

from being broadly, and erroneously, interpreted as providing a federal remedy for 'all

tortious, conspiratorial interferences with the rights of others.'" *Malsh*, 901 F. Supp. at

764 (quoting *Jews for Jesus, Inc.*, 968 F.2d at 291); *see Dolan*, 794 F.3d at 296 (stating

that "the term class 'unquestionably connotes something more than a group of individuals

who share a desire to engage in conduct that the § 1985(3) defendant disfavors'" and to

hold otherwise would permit "innumerable tort plaintiffs" to raise § 1985 claims "by simply defining the aggrieved class as those seeking to engage in the activity the defendant has interfered with" (quoting *Town of W. Hartford v. Operation Rescue*, 991 F.2d 1039, 1046 (2d Cir. 1993))). Although Plaintiff summarily alleges that the discrimination he suffered was "based on his mental illness, race and ethnicity" (Dkt. 46 at ¶ 1; *see id.* at ¶¶ 103 (alleging discrimination "on the basis of Plaintiff's race, ethnicity, and language"), 197 (alleging discrimination "based on Plaintiff's race"), 415 (alleging discrimination "on the basis of his ethnicity and religion")), Plaintiff "fails to allege *any facts showing* he was treated differently due to his membership in a protected class," *Klein v. Zugabie*, No. 15 CIV. 9093 (NSR), 2017 WL 374733, at *8 n.12 (S.D.N.Y. Jan. 24, 2017) (emphasis added); *see Hollman v. County of Suffolk*, No. 06-CV-3589 JFB ARL, 2011 WL 2446428, at *11 (E.D.N.Y. June 15, 2011) (granting summary judgment on the plaintiff's § 1985 claim where he "only offers conclusory allegations that the actions involved discriminatory animus," and finding "no evidence of racial or other class-based animus on the record"); *see also Grant v. City of Syracuse*, No. 5:15-CV-445 (LEK/TWD), 2017 WL 5564605, at *9 (N.D.N.Y. Nov. 17, 2017) ("Alonzo's argument in support of his conspiracy claim consists of conclusory statements that the Arresting Officers' alleged misconduct can only be explained by implicit racial bias. While it is undisputed that Alonzo is African-American, conclusory statements linking officers' actions to race are insufficient to survive

summary judgment." (citation omitted)). Therefore, Plaintiff's § 1985 cause of action is also dismissed.[20]

## X.    Plaintiff's Official Capacity Claims

Defendants argue that "Plaintiff sues certain defendants in their official and individual capacities" (Dkt. 59-2 at 69), although Defendants do not cite to any allegation suggesting that Plaintiff seeks recourse against any defendant in his or her official capacity. However, to the extent Plaintiff seeks such relief, the Eleventh Amendment bars Plaintiff's official-capacity causes of action. *See Gray-Davis v. New York*, No. 5:14-CV-1490 GTS/TWD, 2015 WL 2120518, at *7 (N.D.N.Y. May 5, 2015) ("The Eleventh Amendment has been found to bar official capacity claims for money damages against [DOCCS]

---

[20]    While the Second Circuit does not appear to have directly addressed the issue, a number of courts have ruled that "[t]he 'class of one' theory is insufficient to form the basis for a § 1985 action." *Chance v. Reed*, 538 F. Supp. 2d 500, 509 (D. Conn. 2008) (citing *Am. Nat'l Bank & Tr. Co. of Chicago v. Town of Cicero*, No. 01 C 1396, 2001 WL 1631871, at *12 (N.D. Ill. Dec. 14, 2001) ("While the 'class of one' may qualify under a section 1983 equal protection claim, plaintiffs fail to cite, and this Court fails to find, any case stating that such a class qualifies for protection under section 1985."); *see Royal Oak Entm't, LLC v. City of Royal Oak, MI.*, 205 F. App'x 389, 399 (6th Cir. 2006) ("Plaintiffs argue that just as they may comprise a 'class of one' for purposes of their equal protection claim, they are a 'class of one' for purposes of their § 1985(3) claim. Not surprisingly, Plaintiffs provide no authority whatsoever for this claim, and we reject it."); *C & H Co. v. Richardson*, 78 F. App'x 894, 902 (4th Cir. 2003) (affirming summary judgment on § 1985(3) claims where the plaintiff "does not allege that the complained-of discrimination resulted from its membership in any qualifying class"); *McCleester v. Dep't of Labor & Indus.*, No. CIV.A. 3:06-120, 2007 WL 2071616, at *15 (W.D. Pa. July 16, 2007) ("The emerging consensus among federal authority therefore falls against the 'class of one' theory in the § 1985(3) context."). Although the Court is inclined to agree with the overwhelming consensus of authority that a § 1985(3) conspiracy cannot be sustained by allegations merely sufficient to support a "class of one" equal protection claim, the Court need not decide that issue on the facts presented. Because Plaintiff has failed to allege a "class of one" equal protection claim, he has likewise failed to allege a § 1985(3) based upon a "class of one" theory— assuming such a claim even exists.

- 72 -

officials and parole officers."); *Tompkins v. Beane*, No. 9:10-CV-1200 LEK/RFT, 2012 WL 3079537, at \*6 (N.D.N.Y. July 30, 2012) ("Plaintiff's claims against corrections officers in their official capacities are . . . barred by the Eleventh Amendment."); *Tolliver v. N.Y. State Corr. Officers*, No. 99CIV.9555(JGK), 2000 WL 1154311, at \*2 (S.D.N.Y. Aug. 14, 2000) (dismissing official capacity claims where "[a]ll of the defendants in this case are state officials because they are employees of [DOCCS]").

## XI.    The Failure to Demonstrate the "Personal Involvement" of Several Named Defendants

Plaintiff has also failed to allege the personal involvement of several of the named defendants in any of the purported constitutional violations set forth in his SAC and supplemental papers. "Because Section 1983 imposes liability only upon those who actually cause a deprivation of rights, 'personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.'" *Blyden*, 186 F.3d at 264 (quoting *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994)).

Correctional officer Matthew Null ("C.O. Null") is only alleged to have instructed Plaintiff to stand back from his prison cell door so that "C.O. Null could observe whether Plaintiff was wearing pants." (Dkt. 46 at ¶ 324). This allegation fails to implicate C.O. Null in an unconstitutional act or any other wrongful conduct. As such, any claim asserted against C.O. Null is dismissed.

Correctional officers Jason Lortus ("C.O. Lortus") and M. Ranger ("C.O. Ranger") are alleged to have denied Plaintiff medical attention after Nurse Cheasman allegedly hit Plaintiff's hands with a bucket. (*Id.* at ¶ 213). Plaintiff alleges that the incident was not

recorded in a logbook, which "violat[ed] the doctor's directives, policies, and regulations." (*Id.*). As discussed above, Plaintiff received adequate care and treatment, and the medical records indicate that he was examined on November 22, 2010, but refused to show his hands to the medical staff. (*See* Dkt. 59-10 at 110). Plaintiff's allegations against C.O. Lortus and C.O. Ranger also fail to establish their involvement in any constitutional violation. *See also White v. Rock*, No. 9:13-CV-392 (GTS/CFH), 2016 WL 11478222, at *12 (N.D.N.Y. Feb. 23, 2016) ("The claim that a defendant failed to file an injury report is insufficient to satisfy the subjective prong of the deliberate indifference test."), *report and · recommendation adopted*, 2016 WL 1248904 (N.D.N.Y. Mar. 29, 2016); *Harris v. Howard*, No. 907-CV-1065 TJM/GJD, 2009 WL 537550, at *12 (N.D.N.Y. Mar. 3, 2009) ("Failure to complete reports is simply not an Eighth Amendment claim under any view of the facts."); *Mitchell v. Keane*, 974 F. Supp. 332, 342 (S.D.N.Y. 1997) ("Williams' failure to fill out an injury report does not state an Eighth Amendment claim. An injury report is not medically necessary for a minimally civilized life."), *aff'd*, 175 F.3d 1008 (2d Cir. 1999). Accordingly, C.O. Lortus and C.O. Ranger are also dismissed from this action.

Similarly, Plaintiff has named the Assistant Commissioner of DOCCS Mental Health Services, Diane Vanburen, as a defendant, but has not set forth any allegations that plausibly suggest her personal involvement in any constitutional violation. (Dkt. 46 at ¶ 86). The same can be said for defendant Eileen R. Diniston, the Regional Health Services Administrator (*id.* at ¶ 72), as well as Acting Deputy Superintendent Thomas Tanea (Dkt. 93-5 at 3). No allegations of wrongdoing are asserted against these defendants as well. As a result, they too are terminated from this action.

Likewise, Plaintiff names the Commissioner of the New York State Office of Mental Health, Michael Hogan, the Director of Mental Health Services for DOCCS, Doris Romero, and the Assistant Commissioner of the New York State Office of Mental Health, Howard Holanchock, as defendants in this action, but fails to make any specific allegations of wrongdoing against them either. Instead, he collectively refers to these individuals as the "MHU Defendants" (Dkt. 46 at ¶ 87), and generally claims "[f]or the abuses and complaints chronicled herein, the MHU Defendants are jointly and severally liable due to their participation in the wrongs against Plaintiff and/or their wrongful refusal to address the issues when brought to their attention through complaints and grievances" (*id.* at ¶ 349). However, because none of these three defendants is alleged to have committed any wrongful act, individually or in the collective, the SAC fails to set forth sufficient facts that plausibly suggest their personal involvement in the harms otherwise set forth therein. Therefore, these three defendants are also dismissed from this action.

Relatedly, insofar as Plaintiff seeks relief for Defendants' failure to take action on his grievances or to process his administrative appeals (*see, e.g.*, Dkt. 46 at ¶¶ 248, 264, 271, 313, 320, 408-09, 413), these allegations fail to state a constitutional claim under § 1983. "Generally, the receipt of a letter is insufficient to establish personal involvement under § 1983. Instead, courts typically require something more before finding personal involvement." *Ward v. Rabideau*, 732 F. Supp. 2d 162, 169 (W.D.N.Y. 2010) (citations omitted); *see Candelaria v. Higley*, No. 04-CV-277A, 2008 WL 478408, at *2 (W.D.N.Y. Feb. 19, 2008) ("Numerous courts have held that merely writing a letter of complaint does not provide personal involvement necessary to maintain a § 1983 claim."); *Johnson v.*

*Wright*, 234 F. Supp. 2d 352, 363 (S.D.N.Y. 2002) ("Personal involvement will be found . . . where a supervisory official receives and acts on a prisoner's grievance or otherwise reviews and responds to a prisoner's complaint."); *Gayle v. Lucas*, No. 97 CIV. 0883 (MGC), 1998 WL 148416, at *4 (S.D.N.Y. Mar. 30, 1998) ("Generally, the allegation that a supervisory official ignored a prisoner's letter protesting unconstitutional conduct is not itself sufficient to allege the personal involvement of the official so as to create liability under § 1983."). As such, Plaintiff's allegations that Defendants ignored or failed to act upon his grievances or letters do not state a viable § 1983 claim. *See Walker v. Pataro*, No. 99CIV.4607(GBD)(AJP), 2002 WL 664040, at *12 (S.D.N.Y. Apr. 23, 2002) ("[I]f mere receipt of a letter or similar complaint were enough, without more, to constitute personal involvement, it would result in liability merely for being a supervisor, which is contrary to the black-letter law that § 1983 does not impose *respondeat superior* liability.").[21]

---

[21]    Similarly, to the extent Plaintiff alleges that certain supervisory defendants failed to overturn or otherwise rectify the actions of Five Points medical staff (*see, e.g.*, Dkt. 46 at ¶¶ 140-41, 264), this claim fails to establish a viable § 1983 cause of action as well. Initially, insofar as Plaintiff's claim would impose *respondeat superior* liability upon officials in supervisory positions for the actions of their subordinates, Plaintiff's claim is rejected because, as previously discussed, a § 1983 claim must be premised upon the "personal involvement" of the defendant and cannot be based simply upon theories of vicarious liability. *See Hernandez v. Keane*, 341 F.3d 137, 144 (2d Cir. 2003) ("[S]upervisor liability in a § 1983 action depends on a showing of some personal responsibility, and cannot rest on *respondeat superior*."); *Poe v. Leonard*, 282 F.3d 123, 140 (2d Cir. 2002) ("A supervisor may not be held liable under section 1983 merely because his subordinate committed a constitutional tort."). In addition, supervisory officials without any medical training are permitted to rely upon the medical decisions of experienced and credentialed medical personnel. *See Hardy v. Diaz*, No. 908-CV-1352GLSATB, 2010 WL 1633379, at *7 (N.D.N.Y. Mar. 30, 2010) ("The Superintendent cannot be liable under Section 1983 for failure to supervise the prison medical staff,

Furthermore, "[g]rievance procedures are the internal procedures and requirements of DOCCS, and as such, prison inmates neither have a constitutionally protected right to a grievance procedure, nor, as a general rule, is there a federal right to have them properly administered." *Gomez v. Sepiol*, No. 11-CV-1017SR, 2014 WL 1575872, at *15 (W.D.N.Y. Apr. 11, 2014) (citations omitted); *see Shell v. Brzezniak*, 365 F. Supp. 2d 362, 370 (W.D.N.Y. 2005) ("If prison officials ignore a grievance that raises constitutional claims, an inmate can directly petition the government for redress of that claim."). "Therefore, the refusal to process an inmate's grievance or failure to see to it that grievances are properly processed does not create a claim under § 1983." *Cancel v. Goord*, No. 00 CIV 2042 LMM, 2001 WL 303713, at *3 (S.D.N.Y. Mar. 29, 2001). In addition, because "[t]here is no constitutional right to an inmate appeals process," *Dolberry v. Levine*, 567 F. Supp. 2d 413, 416 (W.D.N.Y. 2008) (quoting *Washington v. Early*, No. 103CV05263LJOSMSPC, 2008 WL 795603, at *15 (E.D. Cal. Mar. 24, 2008), *report and*

---

because he lacks the medical training and authority to do so."), *report and recommendation adopted*, 2010 WL 1633390 (N.D.N.Y. Apr. 21, 2010); *see also Brock v. Wright*, 315 F.3d 158, 164 (2d Cir. 2003) (affirming summary judgment where a supervisory official, who "had no medical training," gave "automatic and complete deference" to certain medical decisions made by the medical staff); *Cuoco v. Moritsugu*, 222 F.3d 99, 111 (2d Cir. 2000) (finding it not unreasonable for a "non-medical prison official" to refrain from "dictat[ing] the specific medical treatment to be given to particular prisoners—for whatever reason"). Such reliance does not demonstrate "personal involvement" in a constitutional violation. *See Morales v. Fischer*, 46 F. Supp. 3d 239, 255 (W.D.N.Y. 2014) (dismissing claims against "the Superintendent" of the correctional facility where he had "no medical training, and [was] entitled to rely on the medical decisions of the doctors . . . in making his decision affirming the denial of [the p]laintiff's grievances"). Accordingly, insofar as Plaintiff alleges that Deputy Superintendents of Administration Jeffrey Minnerly and Matthew Thomas failed to resolve issues related to Plaintiff's medical treatment, Plaintiff's allegations fail to state a claim pursuant to § 1983.

*recommendation adopted*, 2008 WL 2261399 (E.D. Cal. June 2, 2008)), any failure to process Plaintiff's administrative appeals does not support a § 1983 cause of action.

## XII. Plaintiff's Claim for the Failure to Intervene

Lastly, "because '[t]here can be no failure to intervene . . . where there was no constitutional violation,'" *Hardy v. Daly*, No. 17-2906, 2018 WL 4631831, at *1 (2d Cir. Sept. 26, 2018) (quoting *Tavares v. City of New York*, No. 08 Civ. 3782, 2011 WL 5877550, at *7 (S.D.N.Y. Oct. 17, 2011)), Plaintiff's cause of action for the failure to intervene is dismissed, except insofar as Plaintiff has sufficiently stated such a claim associated with the use of excessive force claims that have been permitted to proceed.

## XIII. The Matter is Stayed Pending the Resolution of Defendants' Motion to Revoke Plaintiff's IFP Status

Because some of Plaintiff's claims survive Defendants' motion for partial summary judgment, and Defendants' motion to revoke Plaintiff's IFP status is held in abeyance pending the Second Circuit's decision in *Shepherd*, the Court *sua sponte* considers whether to stay the balance of this action until Defendants' revocation motion can be resolved.

"[T]he power to stay proceedings is incidental to the power inherent in every court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants." *Landis v. N. Am. Co.*, 299 U.S. 248, 254 (1936); *see Javier H. v. Garcia-Botello*, 218 F.R.D. 72, 74 (W.D.N.Y. 2003) ("[A] 'federal district court has the inherent power, in the exercise of its discretion, to stay an action.'" (quoting *Twenty First Century Corp. v. LaBianca*, 801 F. Supp. 1007, 1010 (E.D.N.Y. 1992))). "Accordingly, the decision to issue a stay is 'firmly within a district court's discretion.'"

*Tradewinds Airlines, Inc. v. Soros*, No. 08 CIV. 5901JFK, 2009 WL 435298, at \*3

(S.D.N.Y. Feb. 23, 2009) (quoting *Am. Shipping Line, Inc. v. Massan Shipping Indus.*, 885

F. Supp. 499, 502 (S.D.N.Y. 1995)); *see Louis Vuitton Malletier S.A. v. LY USA, Inc.*, 676

F.3d 83, 97 (2d Cir. 2012) ("[A] court *may* decide in its discretion to stay civil proceedings

when the interests of justice seem to require such action." (quoting *Kashi v. Gratsos*, 790

F.2d 1050, 1057 (2d Cir. 1986))). A court may determine that a stay is appropriate and "in

the interest of judicial economy, . . . pending the outcome of proceedings which bear upon

the case, even if such proceedings are not necessarily controlling of the action that is to be

stayed." *LaSala v. Needham & Co.*, 399 F. Supp. 2d 421, 427 (S.D.N.Y. 2005).

> In determining whether to stay a lawsuit, courts weigh the following factors:
>
> (1) the private interests of the plaintiffs in proceeding expeditiously with the
> civil litigation as balanced against the prejudice to the plaintiffs if delayed;
> (2) the private interests of and burden on the defendants; (3) the interests of
> the courts; (4) the interests of persons not parties to the civil litigation; and
> (5) the public interest.

*Luv N' Care, Ltd. v. Regent Baby Prod. Corp.*, No. 10 CIV. 9492, 2014 WL 572524, at \*2

(S.D.N.Y. Feb. 13, 2014) (quoting *Kappel v. Comfort*, 914 F. Supp. 1056, 1058 (S.D.N.Y.

1996)).

Under the facts presented here, a stay would not unduly prejudice Plaintiff. In fact,

considering the robust medical documentation submitted by Defendants on this motion,

and the law as it currently stands in this Circuit, Plaintiff faces an uphill battle to persuade

the Court that he may maintain his IFP status. To be sure, the Second Circuit may solidify

the approach presently used by courts in this Circuit to evaluate such motions. However,

it may also divert from this approach, or, at the very least, elucidate nuances thereof in a

manner favorable to Plaintiff. In other words, it is in Plaintiff's interest to await the Second Circuit's opinion in *Shepherd* because, as it currently stands, Plaintiff's IFP status would likely be revoked. Defendants would also benefit from the issuance of a stay. Indeed, it would be in their interests to avoid wasting limited resources in discovery disputes against a plaintiff who may not be entitled to IFP status. A stay is in the interests of judicial economy as well. A premature resolution of Plaintiff's IFP status may result in duplicative proceedings before this Court should the Second Circuit decide to depart from the approach taken by the other circuit courts that have opined on the issue. Lastly, while there is no evidence that any non-parties are specifically interested in the outcome of this matter, it is in the public interest to prevent the limited time and resources of the judiciary, the Office of the New York State Attorney General, and *pro bono* counsel from being unnecessarily diverted to a matter that could possibly be impacted should the Court revoke Plaintiff's IFP status.

Accordingly, the Court finds that it is in the interests of justice to require this action be stayed pending the resolution of Defendants' motion to revoke Plaintiff's IFP status.

## CONCLUSION

For the foregoing reasons, Defendants' motion for partial summary judgment (Dkt. 59) is granted in part and denied in part, and Defendants' motion to revoke Plaintiff's IFP status (Dkt. 59) is held in abeyance pending the Second Circuit's decision in *Shepherd v. Annucci*, No. 17-2261 (2d Cir. July 21, 2017). To the extent Plaintiff asserts § 1983 excessive use of force and related failure to intervene claims as well as common law causes of action against Barry Countryman, Jacob Smith, Richard Cioffa, Correctional Officer

VanHorn, Kimberly Cheasman, Annette Holm, Remy Babineaux, Richard Goodliff, Correctional Sergeant T. Barber, Nurse T. Carroll, and Correctional Sergeant D. Gleason, those claims survive Defendants' motion for partial summary judgment. In addition, Plaintiff's Eighth Amendment conditions-of-confinement claims asserted against Charles Coventry and Eric Farley for unlawful prison cell illumination will also proceed to discovery. The Clerk of Court is directed to terminate all other defendants from this action and is also directed to stay this matter until further order of the Court.

SO ORDERED.

ELIZABETH A. WOLFORD
United States District Judge

Dated:      March 15, 2019
            Rochester, New York